### TOLEDO TRACTION, LIGHT & POWER CO. v. SMITH et al.

#### (District Court, N. D. Ohio, W. D.    May 16, 1913.)

#### No. 70.

##### (Syllabus by the Court.)

1. CORPORATIONS (§ 654*)—FOREIGN CORPORATION—POWERS.

A foreign corporation, duly incorporated under the laws of the state of its residence for the sole purpose of acquiring, owning, and holding the stock and securities of an Ohio corporation, may lawfully exercise in the state of Ohio all the incidents of such ownership, including giving assent to change of regulations, and voting stock at all stockholders' meetings, provided that the exercise of such incidents of ownership does not tend to foster monopoly or suppress competition.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2551, 2556; Dec. Dig. § 654.*]

2. CORPORATIONS (§ 642*)—FOREIGN CORPORATION—"TRANSACTING BUSINESS"—"DOING BUSINESS."

Acting as a stockholder, or giving assent as a stockholder, to changes in regulations, by a foreign corporation owning stock in an Ohio corporation, is not "doing business" or "transacting business" in Ohio, within the meaning of either section 178 or section 5508 (3 Page & A. Gen. Code, p. 98), General Code of Ohio. These statutes deal with transactions which are part of the regular business of the foreign corporation, and, under the rule of comity, do not affect occasional or incidental corporate acts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520-2527; Dec. Dig. § 642.*

For other definitions, see Words and Phrases, vol. 3, pp. 2155-2160; vol. 8, pp. 7058, 7059, 7640, 7641.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. CORPORATIONS (§ 56\*)—STATUTES (§§ 174, 175\*)—CONSTRUCTION OF STATUTE—ADOPTION OF REGULATIONS.**

It is the duty of a court, charged with the construction of the meaning of a statute, to give to it, if reasonably possible, that interpretation which will avoid absurd or inconvenient results. Therefore, having in mind the possibilities and absurdities involved if section 8703, General Code of Ohio, is read literally in case of a corporation which has not, under section 8638, provided by its charter that each stockholder shall have an equal voice in its affairs, and considering the terms of sections 8636, 8640, 8642, 8643, 8644, 8665, 8701, 8704, General Code of Ohio, statutes in pari materia with section 8703, it is *held* that, in case of a corporation not being chartered under section 8638, the words "two-thirds of the stockholders," in the provision of section 8703 that "regulations may be adopted or changed by the assent thereto, in writing, of two-thirds of the stockholders," should be considered as if reading "two-thirds of the stockholders in interest."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 152; Dec. Dig. § 56;\* Statutes, Cent. Dig. §§ 254, 266; Dec. Dig. §§ 174, 175.\*]

**4. CORPORATIONS (§ 294\*)—REMOVAL OF DIRECTORS—NOTICE AND HEARING—TERM OF OFFICE.**

The laws of Ohio do not permit the adoption of regulations authorizing the removal at stockholders' meetings of officers or employés chosen or appointed by the board of directors, nor to arbitrarily remove directors. Directors are entitled to hold their positions for the term for which they are elected, unless removed for cause upon notice and hearing.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1263–1266; Dec. Dig. § 294.\*]

**5. CORPORATIONS (§ 291\*)—DIRECTORS—TERM OF OFFICE.**

Directors of a corporation in Ohio are elected to serve to the next annual election after the date of their election, if elected by the stockholders; and when elected at a regularly appointed annual meeting they are entitled to hold for one year, unless sooner removed for cause. In such cases their terms of office cannot be shortened by a change of regulations to go into immediate effect, in which the date of the annual meeting is moved.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1250–1254; Dec. Dig. § 291.\*]

**6. CORPORATIONS (§ 320\*)—ACTIONS—NECESSARY PARTIES.**

It is not necessary, in all cases, for one interested in a corporation as bondholder, stockholder, creditor, or otherwise, and whose rights are affected by matters affecting the interests of the corporation, to join in an action to preserve his rights the corporation itself, or other parties in substantially the same interest as himself. If the court is able to do justice to the parties before it, without injury to others not made parties, the case may proceed.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1435–1439; Dec. Dig. § 320.\*]

**7. EQUITY (§ 46\*)—GROUNDS—REMEDY AT LAW.**

The remedy at law, to exclude a concurrent remedy in equity, must be adequate, practical, and as efficient to the ends of justice and its prompt administration as that in equity. *Held* that, in the case at bar, the interests affected by the litigation being such as would suffer by the delays incident necessarily to processes of law, equitable jurisdiction obtains, although a controlling factor of determination is a question of law; the only remedy at law, that of quo warranto, not existing as a matter of abstract right, but resting for its employment in the discre-

tion of public agencies not having a special interest in the vital issues involved in the controversy.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 151, 152, 157, 159–163; Dec. Dig. § 46.*]

8. CORPORATIONS (§ 654*)—TRANSFER OF FRANCHISE—FOREIGN CORPORATION— VOTING OF STOCK.

To permit the exercise of the right of voting majority holdings of stock in an Ohio public utilities company by a foreign corporation, whereby the latter secures the election of a board of directors in the former, is not equivalent to transferring to such foreign corporation the franchise, permit, or license to own, operate, manage, or control public utilities under section 614—73, General Code of Ohio, which forbids the granting or transferring to a foreign corporation of the franchise, permit, license, or right to own, operate, manage, or control such utilities.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2551, 2556; Dec. Dig. § 654.*]

In Equity.   Suit by the Toledo Traction, Light & Power Company against Barton Smith and others.   Temporary injunction granted.

King, Tracy, Chapman & Welles and Rathbun Fuller, all of Toledo, Ohio, and Frueauff & Robinson, of New York City, for plaintiff.

Smith & Baker, Wm. H. McLellan, Jr., Erwin R. Effler, and Maurice Allen, all of Toledo, Ohio, for defendants.

KILLITS, District Judge.   The Toledo Traction, Light & Power Company, a Maine corporation, claiming to own more than four-fifths of the capital stock of the Toledo Railways & Light Company, an Ohio corporation, hereinafter called the "Local Company," and to own more than $11,000,000, being nearly the entire issue, of the bonded indebtedness of such corporation, sues in this court to restrain Barton Smith, Maurice Allen, Louis E. Beilstein, Heman S. Swift, William R. Hodge, Erwin R. Effler, Conrad Weil, Frank Hafer, Jay K. Secor, Charles F. Meilink, and William H. McLellan, Jr., residents of Ohio, from interfering with the management and possession of the franchises and properties of the Local Company, by certain persons named in the bill, who, plaintiff claims, are the 21 directors and the officers of such Local Company.   A temporary restraining order was issued, returnable in two days, and the case has been heard on a large record on motion for a temporary injunction.

The Local Company controls and operates all the street railways of the city of Toledo, an electric light and power plant, a heating plant, artificial gas plant, interurban union station, and several independent suburban electric railways, either through its own charter powers directly, or through the several corporations which are subsidiary to it. Prior to April 14, 1913, the board of directors of the Local Company consisted of nine persons, and eight of the defendants were, without question, up to that date members of such board, and each still claims to have that capacity.   Of course, a very large question in this case already appears to be that of title to the offices managing the corporation; but in the opinion of the court that issue, although important to the extent of controlling the decision of the case, is, however, but in-

cidental to the court's jurisdiction in equity, which will be hereafter discussed.

It is logical to first consider the question of title. Plaintiff claims that, because of a change in the regulations of the Local Company, which will be treated at length later, a vacation of the offices of the old directors and officers was effected on the date last named, and an enlarged directorate, with altogether a new personnel, save one man, was then chosen and qualified. Four of the defendants claiming to be directors were regularly chosen at the annual election in January last, held according to the regulations. In one way it is claimed the attempted change in regulations affected these men, and that is that the third Monday of April was named as the day for the regular annual meeting, such change to go into effect in 1913. The result of this change, if legally made, acting in conjunction with an old provision of the regulations, readopted in the amendment, which authorized the removal of directors at any special meeting of stockholders called for the purpose by a majority vote, so far as the term of office of these four directors is affected, is to be immediately considered.

[4] We are clear that the regulation for removal of directors, attempted to be acted upon at the meeting of stockholders April 14th, called for the purpose, is contrary to law, if it is to be considered as authorizing arbitrary removals. No such power inheres in the body of stockholders, unless it is conferred by statute. Thompson on Corporations, § 1084; Cook on Corporations, §§ 624, 711, and cases cited. Such power is not only not conferred by the statutes of Ohio, but section 8704, General Code, detailing what may be provided in the regulations, being silent on this point, by well-known rules of interpretation we must hold that the power is altogether wanting. This section reads:

"When no other provision is specially made in this title, a corporation by its regulations may provide—

"1. The time, place and manner of calling and conducting its meetings.

"2. The number of stockholders or members constituting a quorum.

"3. The time of the annual election for trustees or directors, and the manner of giving notice thereof.

"4. The duties and compensation of officers.

"5. The manner of election, or appointment, and the tenure of office, of all officers other than the trustees or directors. * * * *"

The power to remove a director for cause, of course, inheres in every corporation as an incident of its being; but there does not appear in the minutes of the meetings of plaintiff's stockholders that anything but an arbitrary removal of any of the directors named as defendants was attempted. If the removal is for cause, the accused director is entitled to a hearing.

[5] We come now to consider whether the change of regulations providing for an annual meeting in April, rather than January, the old month, to take effect in 1913, was efficacious to remove the four directors in question. We are of the opinion very clearly that, irrespective of whether the regulation changing the date was properly adopted, it cannot be employed to terminate the tenure of office of either of these four men. All the Ohio statutes speak of annual elections at which directors shall be chosen.

Section 8635, for instance, provides that as soon as a certificate is made the stockholders shall meet to choose directors, "to continue in office until the time fixed for the annual election, and until their successors are elected and qualified."

Section 8647 provides when the annual election shall be held, unless otherwise provided in the regulations, and makes a provision for the election of directors when there is a failure to elect at the annual meeting.

Section 8662 provides that a vacancy in the board of directors, unless otherwise provided by the by-laws, may be filled by the board itself "for the unexpired term."

Section 8665, concerning the increase of the number of directors, provides that the additional number shall "hold their offices until the next annual election for directors and until their successors are elected and qualified."

Section 8704, already quoted, in the fifth subsection thereof, withholds from the stockholders power by regulation to affect the tenure of office of directors, while in subsection 3 it grants right to fix the date for the "annual election" of directors.

The effect of the language of these statutes is clearly to make the term of a director regularly elected at an annual meeting to be for one year, or until the next annual election, and that no power abides in the stockholders, in any method short of removal for cause, to shorten this term. We are in entire accord with the reasoning in that behalf of the superior court of Cincinnati in Lutterby v. Brewing Co., 12 Ohio Dec. 67. See, also, Thompson on Corporations, § 1080. We are therefore constrained to hold that, so far as this action seeks to affect the right of the defendants Meilink, Hafer, Secor, and Weil to serve as directors of the Toledo Railways & Light Company, it must fail, and that consequently Messrs. Taylor, Heater, Winkworth, and N. A. Tracy, who are claimed to have been chosen to succeed them, have no valid title to places on the directorate.

At a meeting on February 8 the defendant Swift was regularly elected a director by the remaining directors to fill a vacancy. It has been noticed that section 8662, General Code of Ohio, provides that regulations may be adopted authorizing the stockholders to fill vacancies in the board of directors temporarily filled by action of the directors themselves. By some misapprehension of the facts, plaintiff's stockholders' meeting attempted to remove Swift by the operation of that paragraph of the regulations purporting to give the stockholders the arbitrary right to remove a director (an action which, as appears above, in our judgment, was void because the law gives no power of enactment of such a regulation), and to fill the vacancy which he was theretofore temporarily filling by the election of the board of directors.

The resolution to effect his removal very clearly classified him with Secor, Hafer, and Meilink as being of the four who were elected at the annual meeting, and it recites that the action is taken under the provision of the regulations which provides for the arbitrary removal from office by a majority vote of the stock of the company at any

special meeting. Through misunderstanding at this meeting Weil and Swift were transposed; the former being classified with Hodge, Effler, and Allen. The language of the minutes is so explicit and plain that the court has no alternative but to hold that the position theretofore held by Mr. Swift was not legally filled, assuming that any of the action of this meeting was legal, and that consequently Swift remains a director by virtue of his regular election in February to fill a vacancy, wherefore Coup, whom the meeting attempted to elect in his place, has no office.

We are left now to consider whether the defendants Allen, Effler, and Hodge remained directors after April 14. Involved in that question is the regularity of the stockholders' meeting on that date. If it were regularly and properly called as a special meeting, then, as we have seen, it had power to fill the places occupied by these three gentlemen temporarily by virtue of their several elections in February to fill vacancies. Prior to the attempted amendment by plaintiff's assent, it was provided that special meetings of the stockholders might be ordered by the directors, or a majority thereof, in writing on 10 days' notice. The change attempted to be effected consisted in adding a provision that special meetings might be ordered "by the owners or duly authorized representatives of the owners of a majority of the capital stock of said company or by any three stockholders," and that the notice should be five days. The call for this meeting on the 14th of April was signed by seven stockholders, one of whom was the plaintiff, by its duly authorized attorney in fact, and the notice given exceeded five days by a few hours. The primary inquiry here is whether these regulations were lawfully changed. As we have seen, as to the directors Meilink, Secor, Weil, Hafer, and Swift, such an inquiry is not necessary. The first step is to determine the right of the plaintiff, a Maine corporation, to act at all in the premises.

[1] It is said, first, that the plaintiff's charter powers are obnoxious to the laws and policy of Ohio. Before we consider what they are, it is profitable to review the circumstances leading to the incorporation of plaintiff. The Toledo Railways & Light Company, herein called the Local Company, is, as we have noted, the paramount corporation in Toledo. Its issued capital stock is of the par value of $13,875,000, and its other indebtedness and liabilities of various kinds, computed to January 1, 1913, were nearly $18,000,000, making its aggregate liabilities $31,462,246.

The charter of the plaintiff is the outcome of negotiations through the previous winter of conflicting interests in the Local Company, heavily overcapitalized and overbonded as it was, and in conflict with the city over street franchises expired and about to expire, and because of controversies over fares and service. A foreclosure action was also pending in this court. These interests had gathered under two committees, the Bondholders' Protective Committee and the Stockholders' Protective Committee. A reorganization committee, which we will hereafter refer to as the "Committee," was organized from the membership of the two committees last named, and in November last formulated and submitted a plan of reorganization, which we will

hereafter designate as the "Plan." The Committee also entered into a contract, hereinafter referred to as the "Contract," to become binding when the Plan should have been declared operative, with the firm of H. L. Doherty & Co., of New York, bankers and public utility operators, to take over the control and operation of the franchises, business, and properties of the Local Company and of the subsidiary companies until January 1, 1918. It is agreed by all of the parties to this case that this Contract was, and it may be hoped is yet, big with promise for relief to bondholders, creditors, and stockholders, as well as offering some advantages to the public, which, after all, pays all the bills and furnishes a very significant portion of the capital and plant in the form of franchises.

Such features of the Plan as may be important to this discussion will be noticed from time to time. Now it is not necessary to do more than to say that plaintiff's organization was contemplated by it and by its devisers and all parties interested from the beginning as an essential element. A "new company" was to be organized "under the laws of such state" as the Committee "may deem desirable." The term "New Company," as expressed in the Plan, was "intended to mean whatever company may be finally utilized to issue the new securities to be issued under the Plan." The document provided that the New Company should acquire as far as possible the securities and shares of the Local Company and its subsidiaries, getting thereto complete title. In payment for the obligations so acquired, and to carry out the terms of the Plan, including the liquidation of floating indebtedness, to retire securities which could not be absorbed, to pay the estimated present cash requirements of the plan in the amount of more than $1,000,000, to reserve for future extensions and improvements in the amount of $1,500,000, and to provide for the compensation of Doherty & Co., who were to get $2,000,000 par value of the common stock and to underwrite securities not absorbed in exchange, the New Company was to be authorized to issue its 6 per cent. first and second lien collateral trust notes in the sums of $7,500,000 and $1,200,000, respectively, and 6 per cent. cumulative preferred stock and common stock in the sums of $8,000,000 and $9,200,000, respectively, wherefore plaintiff was capitalized in its charter for $17,200,000. Some of the securities for which the Local Company was liable, or which were liens on some of its property, and, of course, all of its stock, were to be subject to scaling in the exchange; a stockholder in the Local Company, if he paid $7.50 in cash into the Plan for each share of the old stock held by him, getting for each share $7.50 worth of preferred stock in the New Company and 43 per cent. par value of his old stock in the common stock of the New Company, while the stockholder who came into the Plan, but who did not pay in any more money, received 13 per cent. of his old holdings in common stock of the plaintiff.

Upon the perfecting of the Plan, the Stockholders' Protective Committee, with the approval of its counsel, Mr. Smith, defendant in this case, addressed an amply explanatory statement and letter to the stockholders, advising them to come in under the Plan and take the

option which incurred the payment of the $7.50 for each share of stock, and they were assured that the Plan "will vest in the New Company all the securities of the Toledo Railways & Light Company which are deposited under" it, except bonds of three of the subsidiary companies, amounting to over $4,000,000, which would not mature for several years. The result of this recommendation and of the other activities of the interested parties was that $715,000 in cash were furnished by the old stockholders under the provision for the payment of $7.50 per share, and that the plaintiff acquired 117,447 of the 138,-750 shares of the Local Company's stock and more than $11,000,000 par value of its securities.

Depositing stockholders of the Local Company did not get in hand their stock of plaintiff's issue. A voting trust was organized, and the stock was deposited with a trust company; the depositing stockholders receiving a representative amount of voting trust certificates. The voting trust, which had no function touching the stock of the Local Company, consisted of seven members divided into three classes. A majority were nominees of Doherty & Co., and it was provided that a vacancy occurring in this class was to be filled by the surviving members of the class. The other three members were divided as representatives of bondholders and stockholders; the bondholders getting two. It will be seen that these provisions secured the control of the voting trust to Doherty & Co. As part of the Plan, also, and as finally completing it, the plaintiff itself entered into a contract with Doherty & Co. whereby the latter undertook to carry out, so far as the plaintiff's interests were concerned, faithfully the terms of its contract with the Committee to operate the local franchises and utilities.

It will be noted that the Contract with Doherty & Co. was made by a Committee which had no legal relation to the Toledo Railways & Light Company, and which was a purely voluntary organization, with absolutely no authority in the premises, acting for the benefit of the Local Company only as the interests of the latter coincided with those of the elements constituent to it. It was still necessary, before Doherty & Co. could begin the performance of its responsibilities under the Contract, that the firm sustain some direct relation with the Local Company. Short of a formulated contract of employment entered into by the local directors with Doherty & Co., whereby the directors specifically clothed the firm with absolute authority in the premises and abrogated their functions (which sort of contract it is not likely the directors could lawfully make), the only way in which those interested in the Local Company could obtain the full fruitage of the Contract, and through which Doherty & Co. could perform the best service under it, was by having constantly a board of directors friendly to it, acceding to its advice in all the details of management upon which the directors by law should pass. It is readily apparent that Doherty & Co. would be at peril of great embarrassment, to say the least, from an indifferent or hostile board of directors, and that the utmost harmony between the officiary of the Local Company and the contracting operator was essential in order that the bondholders and stockholders should profit by the arrangement, to say nothing of

that long-suffering and generally neglected, but largely interested, other party, the public. We can see plainly that to meet this situation was one of the two causes for the creation of the plaintiff corporation; the other being the necessity for a convenient vehicle for the handling of the financial problems involved in dealing with the immense mass of securities which had been emitted by the Local Company.

Plaintiff's charter provides that it is authorized—

possess, and to sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock of, or any bonds, mortgages, debentures, notes or other securities, obligations, contracts and evidences of indebtedness of the Toledo Railways & Light Company, the Maumee Valley Railways & Light Company, the Toledo, Ottawa Beach & Northern Railway Company, the Toledo Gas, Electric & Heating Company, the Toledo & Western Railroad Company, the Toledo & Western Railway Company, the Toledo Casino Company, the Ottawa Park Street Railway Company and the Interurban Station Company, all corporations organized and existing under and by virtue of the laws of the state of Ohio, and also the Adrian Street Railway Company and Toledo Beach Company, corporations organized and existing under and by virtue of the laws of the state of Michigan, and of any other corporation or corporations, associations or voluntary organizations, private, public or quasi public, now or hereafter organized for or engaged in, directly or indirectly. "to purchase, subscribe for and invest in or otherwise acquire, own, hold and the business of transportation or furnishing light, heat, water or power in the city of Toledo, state of Ohio, or the territory adjacent thereto, and, while owner of such shares of stock, to exercise any and all the rights, powers, and privileges of individual ownership thereof, including the right to vote thereon and with respect thereto, and to receive all dividends and payments thereon, to collect, receive, and enforce the payment of the principal and interest of all such bonds, securities, and other obligations at any time held by it and to enforce the covenants, conditions, and provisions of any mortgages or liens securing the same, to loan money to or to aid in any lawful manner whatsoever any such corporation, association, or voluntary organization whose shares of capital stock, bonds, or other obligations, or any part thereof, are or may be owned, held, or in any manner guaranteed by this corporation, and to do any and all lawful acts and things to protect, preserve, improve, or enhance the value of any such shares of capital stock, bonds or other obligations or the property represented thereby, to do any and all such other lawful acts and things tending to increase the value of any property at any time owned, held, or controlled by this corporation."

We interpret this language, as it is explained by the transactions leading up to the creation of plaintiff and the functions it was to perform as part of the Plan, assuming with all the parties to this case absolutely without exception that the Contract promised to be highly beneficial, to mean that the relation of plaintiff to the Toledo Railways & Light Company is to be entirely benevolent; no monopoly is possible; nothing is proposed which private individuals might not freely combine to do in partnerships; nothing is described which a banking, insurance, or investment corporation in Ohio might not do (they could become owners of a majority of stock, and then do what this charter describes). In short, as the origin of plaintiff shows, it amounts to nothing more than a combination of interests of a majority of the stockholders to common action. That plaintiff, therefore, should be allowed here to exercise the privileges of stock ownership common to all stockholders is apparent, unless considerations to be later noted prevent.

Thompson on Corporations, § 6626, says:

"The law of comity, in its application to the question of the right of a corporation to act in another state or country, is that a corporation created by the laws of one state or country is permitted to do business in another state or country and sue in its courts, unless expressly prohibited by statute or the recognition of the corporation is contrary to the public policy of the state. The law of comity is a part of the common law, and the courts give it the effect that they give to any other rule of the common law."

A principle which is indorsed in Ohio. Bank v. Jones, 16 Ohio St. 145; Newburg Petroleum Co. v. Weare, 27 Ohio St. 343; Humphreys v. State, 70 Ohio St. 67, 70 N. E. 957, 65 L. R. A. 776, 101 Am. St. Rep. 888, 1 Ann. Cas. 233.

This is not such a situation as that which the court had to deal with in Franklin Bank v. Commercial Bank, 36 Ohio St. 350, 38 Am. Rep. 594, where charter powers were sought to be exceeded by a banking corporation to the result, if accomplished, of stifling competition; nor that in Railway Co. v. Iron Co., 46 Ohio St. 44, 18 N. E. 486, where a specific limitation of a state statute was being exceeded; nor that condemned in State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541, a decision against an unmistakable monopoly; nor that which the court, in Railway Co. v. State, 49 Ohio St. 668, 32 N. E. 933, said "would be void as against the policy of our corporation law," being a plan "whereby the stock is placed in the hands of trustees, who are invested with the power of voting it as their interests may dictate, irrespective of the wishes or direction of the owners," for here great care is taken to safeguard every interest, and the plaintiff is to act only as the convenient and practical instrument for executing the wishes of those who were owners of the stock it now controls, and who hold now proportionate and representative shares of its own stock. We are utterly unable to find any judicial enunciation of policy in Ohio which applies to the purposes for which plaintiff is chartered, or which reprobates the things which it is trying to do.

As to a statutory declaration of policy, that which is expressed in the Code of Ohio is favorable, for section 8683 provides:

"A private corporation also may purchase, or otherwise acquire, and hold shares of stock in any other kindred but not competing private corporations, domestic or foreign."

If we construe the qualifying word "kindred" as involving a corporation of the same class as the one seeking to acquire its stock, the policy of this statute is broader than necessary to justify plaintiff's acting to the full share of a stockholder's powers. If this word is to be narrowly construed as meaning "congenial" or "sympathetic," which are not distant synonyms, then the statute very nearly if not quite reaches the situation.

Section 8623, General Code of Ohio, provides:

"Except for carrying on professional business, a corporation may be formed for any purpose for which natural persons lawfully may associate themselves."

It must be conceded that "natural persons lawfully may associate themselves" to pool their holdings of stock or securities issued by a corporation and employ their aggregation of power to the common benefit. What more is the plaintiff trying to do? What more was plaintiff organized or chartered to do, as shown by the terms of its charter quoted above? To be sure, the statute uses the word "purpose" in the singular, and "intentionally" so, as the court says in State ex rel. v. Taylor, 55 Ohio St. 61, 44 N. E. 513, "and a corporation cannot be formed for two or more distinct purposes, in the absence of specific statutory authority." But what is there here more than authorization to act as an owner of securities of the Local Company? The details set out in the charter are but incidents to the holding—such things as any natural person could do.

If the plaintiff may not exercise in Ohio the powers and rights generally of a stockholder, then it would seem to us that the Plan was futile, and that all the labors of the various gentlemen who worked through last winter to this end had come to naught, and that the stockholders of the company who had contributed the large sum of $715,000 were that much poorer. Their stock, then, has been exchanged for voting certificates representing stock in an emasculated corporation, which cannot realize on its securities because the latter are based upon the foundation that it is clothed with all the rights of a majority stockholder by the Local Company. Doherty & Co. have no responsibility directly to the Toledo Railways & Light Company. It might not have any responsibility to the other contracting party, the Committee, if that body was unable to give to it the full opportunity of management which an assuredly friendly directorate only could afford.

Notwithstanding some claims made in the progress of the trial, the court is unable to find that the right to vote 117,447 shares of stock deposited for plaintiff rests in any person or any body of men other than the plaintiff. Possibly litigation might restore to the numerous depositing stockholders their respective holdings; but we hardly care to express an opinion that any litigation is practical which would bring back into their several pockets the cash outlay suffered by them at the rate of $7.50 per share held by each, a great part of which has already been expended. Surely this court ought not to be asked to make a decision which would render the securities of plaintiff unmarketable, with such disastrous results as would necessarily flow, not only to stockholders in the Local Company, but others, from such a condition, unless we are shown some policy of Ohio, clearly defined by statute or judicial decisions, which compels such a result.

A corporation, empowered to own stock, has an incidental right to vote it, and the exercise of such right violates no public policy, in the absence of a statutory prohibition and when no monopoly is thereby created. Bigelow v. Calumet & Hecla Mining Co., 167 Fed. 721, 94 C. C. A. 13.

[2] It is next insisted that plaintiff can exercise none of the powers of a stockholder until the provisions of sections 178 and 5508, General Code of Ohio, are complied with. They are:

"Sec. 178. Before a foreign corporation for profit transacts business in this state, it shall procure from the secretary of state a certificate that it has complied with the requirements of law to authorize it to do business in this state, and that the business of such corporation to be transacted in this state, is such as may be lawfully carried on by a corporation, organized under the laws of this state for such or similar business, or if more than one kind of business, by two or more corporations so incorporated for such kinds of business exclusively. No such foreign corporation doing business in this, state without such certificate shall maintain an action in this state upon a contract made by it in this state until it has procured such certificate. This section shall not apply to foreign banking, insurance, building and loan, or bond investment corporations."

"Sec. 5508. All foreign corporations, and the officers and agents thereof, doing business in this state, shall be subjected to all the liabilities and restrictions that are, or may be imposed upon corporations of like character, organized under the laws of this state, and shall have no other or greater powers. Every contract made by or on behalf of any such foreign corporation, affecting the liability thereof or relating to its property within this state, before it shall have complied with the provisions of section 178 of the General Code, shall be wholly void on its behalf and on behalf of its assigns, but shall be enforceable against it or them. Nothing contained in this section shall be held or construed to apply to insurance corporations, fraternal beneficiary associations, or building and loan associations required by law to report to the superintendent of insurance, nor to repeal, change or modify the provisions of section 188 of the General Code." 3 Page & A. Gen. Code, p. 98.

It is important to consider whether to vote stock or assent to a change in the regulations is "transacting business" or "doing business" within the meaning of these statutes. It is to be noted that section 5508 does not make void any business done before obtaining a certificate under section 178 save a contract entered into; but, of course, a court of equity would not by its decree permit such a defaulting foreign corporation to reap the benefit of actions by it performed which could fairly be said to be doing or transacting business, so we must determine whether to vote stock or to assent to a change in regulations is fairly within the inhibition of these statutes, remembering that, as the latter derogate from the operation of the rule of comity by putting restrictions upon things done by foreign corporations which a natural person or local corporation might properly do, they must be construed in the respects under consideration with some strictness. Judge Hammond, in Cæsar v. Capell (C. C.) 83 Fed. 403, 412, after commenting upon the power of states to place restrictions upon the operations within their borders of foreign corporations, states the rule which all courts are undoubtedly following respecting legislation of this class as follows:

"But one cannot read the cases relative to the restrictive legislation of the states without at once observing that the courts everywhere are doing all they can to confine this absolutism which nowhere else exists under our laws, within the reasonable bounds of due regard for the ordinary principles of justice, at least."

It is not every act done by a corporation and an exercise of its corporate powers that amounts to "transacting business" or "doing business" within the terms of these statutes. For instance, the change of a form of certificate of stock held in this state and issued by the plaintiff, a foreign building and loan company, and pledged to it as collateral for a loan upon which it sues in this state, is not. Demland

v. Loan Co., 11 Ohio C. D. 249. Nor the bringing of an action in this state by a foreign corporation to recover compensation for land unlawfully taken by a railroad company. Trust Co. v. Railway Co., 7 Ohio N. P. (N. S.) 497. These are all the Ohio decisions which have much point. They are consistent with the interpretation of similar language in statutes of other states, as to which operates the rule stated by Thompson (section 6671) as follows:

"The transaction of occasional or incidental corporate business does not necessarily bring a corporation within the provisions of such a statute, though it may be more than a single transaction. If the matters performed are merely incidental to the carrying on of the general corporate business in its own domicile, it may not be doing business within the meaning of such a statute."

The question in its varied aspects is treated by Thompson in chapters 181 and 184 (Corporations, 2d Ed.). This was the early holding of the Supreme Court of the United States construing the stringent provision of the Colorado Constitution (Cooper Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137), and has continued to be the tenor of judicial opinion to the present (Thompson, § 6716). The rule is most succinctly stated by Judge Sanborn in the syllabus paragraph prepared by him to a decision by the Circuit Court of Appeals of the Eighth Circuit (Blodgett v. Lanyon Zinc Co., 120 Fed. 893, 58 C. C. A. 79), as follows:

"In the absence of an express provision of statute to the contrary, the innocent acts and contracts of a foreign corporation, which has failed to comply with the statutes permitting it to do business in the state where the contracts are made and the acts done, are valid and enforceable, because it is not the intent of the authors of such laws to strike down contracts or acts in performance of them that are not evil in themselves."

We have noted a feeling that to hold against the right of the plaintiff to act in Ohio is to undermine the foundations of the Plan, which every voice in this case commends to be highly advantageous to the Local Company at least, and that, if plaintiff is emasculated by a holding that it cannot act in the capacity of a stockholder, the Contract, which again every voice proclaims to be of great and beneficent promise, becomes a futile thing. Wherefore, in the absence of a construction of the scope of the statutes by Ohio courts, we feel constrained to follow the authority indicated, and to say that the acts in question— voting stock and assenting to regulation changes of the Local Company—are no more than incidents to plaintiff's business. Its real business is to hold and maintain the value of the Local Company's securities and to give it a chance for its life. The two Ohio statutes are more restrictive than those in some other states, in that they avoid contracts. Wherefore the full force of the rule laid down by Judge Sanborn, supra, does not apply here, but in the respects under consideration they are not different from those of other states. The fact that they speak so particularly of such formal business as the making of contracts suggests that they are intended to strike at formal and principal business acts. So we hold that nothing in these sections prevents plaintiff from exercising the right of a stockholder to vote stock or to assent to change in regulations.

[3] The attempt to change the regulations was made under favor of section 8703, which reads:

"Regulations may be adopted or changed by the assent thereto, in writing, of two-thirds of the stockholders, or, if there is no capital stock, of the members, or by a majority of the stockholders or members, at a meeting held for that purpose, notice of which has been given by the acting president personally to each member or stockholder, or by publication in some newspaper of general circulation in the county in which the corporation is located, or in the counties through which its improvement does or will pass."

And the only thing done by way of attempting to comply with this section was by plaintiff filing a statement, signed by it through its specially authorized attorney in fact, setting out the amended regulations sought to be placed upon the company. The question raised, therefore, is whether the assent of two-thirds of the shares of stock filed by the owner thereof meets the provision of the statute which says that "two-thirds of the stockholders" may change the regulations by filing an assent in writing. It must be conceded that, if this section is taken literally, a very inconvenient result is possible. For instance, four stockholders, holding each a single share of a company issuing 100 shares, could change regulations every succeeding day until enjoined, against the wishes of two persons, holding 96 shares. It hardly seems possible that a Legislature ever intended so absurd a result.

On the other hand, we can see some reason why the holders of stock to the extent of two-thirds of the issue should have this power—reasons not altogether absent from this case—for otherwise a board of directors ceasing to represent the majority interest might seriously embarrass that interest without incurring penalty of removal. In this case, for instance, the defendant directors are confessedly temporary incumbents, and their direct interest in the company through their shareholding is infinitesimal compared with that of the plaintiff. If the statute is to be read literally, then the plaintiff, though overwhelmingly in the majority as far as shares go, must either submit to the possible dictation of individual stockholders, whose numbers may be formidable, but whose holdings are grotesquely small in comparison, or enter into a contest of dividing holdings until it has swamped the minority by the numbers of its friends each holding a single share.

While power to alter regulations is limited by the power to make them, and must be referred to one of the classifications of section 8704, General Code, namely:

"1. Time, place and manner of calling and conducting its meetings.

"2. The number of stockholders or members constituting a quorum.

"3. The time of the annual election for trustees or directors, and the manner of giving notice thereof.

"4. The duties and compensation of officers.

"5. The manner of election, or appointment, and the tenure of office, of all officers other than the trustees or directors"

—yet it is readily to be seen that in each one of these lurks opportunity for serious mischief to majority holdings if the language of section 8703 is to be read as giving stockholders per capita representa-

tion in signifying written consent.  As instances, changes in either provisions 1 or 4 might be especially fruitful of embarrassment.  We are aware that courts ought not to disregard the plain meaning of terms merely to avoid inconvenience, but it is equally a vital rule of construction that, if possible, an interpretation should be given which will avoid manifest absurdities.

It is profitable to consider statutes in pari materia for the light they shed on the question now before us, and such consideration indicates very clearly that the law's policy in Ohio is that issues affecting the corporation are to be decided by the power of shares of stock rather than by the stockholders considered as individuals.  Section 8638 should be referred to for the light which it sheds:

"A corporation may provide in the articles of incorporation that each stockholder, irrespective of the amount of stock he owns shall be entitled to one vote, and no more, at an election of directors or upon any subject submitted at a stockholders' meeting.  When such provision is made the corporation shall be governed thereby."

The setting of this statute unmistakably indicates that it is to be considered as providing an exception to the ordinary method of determining corporation questions.  It is not applicable to the local corporation, and is instructive, in that it is a statutory alternative for the practice which a corporation not chartered under it must follow.

Section 8636 provides specifically that at stockholders' meetings "each stockholder shall have the right to vote in person or by proxy the number of shares owned by him," and that in the election of directors "a majority of the number of shares shall be necessary for a choice."

By section 8665, through "a vote of a majority of its stock, at a regular meeting of an incorporated company, it may increase the number of its directors," and the provision is further made that at a special meeting of the stockholders called for the purpose "by a vote of a majority of its stock" an increase in the number of directors may be made.

Section 8640 provides that within a certain time before meeting held for the election of directors or trustees, "or for the determination of any question, by the stockholders of a corporation * * * any person or persons entitled to vote thereat *and owning at least one-tenth interest in its stock*" may apply to a court for the appointment of inspectors, which indicates that the degree of interest in the company as shown by the amount of stock held is the test of a stockholder's voice.  In the sections following 8640 (8642–8644), in case inspectors are appointed under such application, the language indicates unmistakably that it is the duty of inspectors to ascertain the holdings of the several stockholders in order to determine the respective voting capacities.

These statutes seem to us conclusive to the point that the policy of the state law is that, save in the exception provided for in 8638, the majority in interest in a corporation shall control its affairs.  Section 8701 reads:

"Every corporation may adopt a code of regulations for its government consistent with the Constitution and laws of the state."

205 F.—42

And section 8704, which we have heretofore quoted, limiting the range of regulations, provides that the corporation may by regulation order *"the number of stockholders * * * constituting a quorum."* Undoubtedly, having reference to the statutes just referred to and to the language of section 8701, we are required to construe the word "stockholders" in section 8704 as meaning shares of stock in corporations not having taken advantage of section 8638. Otherwise it would be competent for a corporation to fix a quorum which would have no capacity to do the business provided for by sections 8636 and 8665.

No reason appears why in amending regulations there should prevail a different representation from that required when other important business is to be transacted. Our conclusion is that every consideration requires that, when an attempt is made to change the regulations in a corporation not affected by section 8638, the change can be only effected by the assent in writing of those stockholders who own two-thirds of the shares of stock, and that the word "stockholders" in section 8704 must be construed as if reading "two-thirds of the stockholders in interest." This same section provides that at a meeting called for the purpose a majority of the stockholders may change the regulations. This provision renders the absurdity all the greater, if the representation is to be per capita, rather than by extent of holdings.

It is said that this statute is vicious, in that it affords an opportunity, if so construed, to oppress the minority. That may be, but minorities in corporations have always the court's protection against the tyranny of the majority, and it would seem that the oppression of the minority by the majority is not likely to be as mischievous to the corporation itself as if the conditions were reversed. Our construction is in sympathy with the tenor of judicial decision wherever the question has been raised. The precise point was decided in State of Washington v. Horan, 22 Wash. 197, 60 Pac. 135. There the statute under consideration read:

"It shall be competent at any time for two-thirds of the stockholders of any corporation organized under this chapter to expel any trustee from office and to elect another to succeed him."

And the court was asked to say that the words "two-thirds of the stockholders" meant "holders of two-thirds of the stock," and the issue arose in a case where two-thirds of the shares of stock were voted in favor of the removal of trustees, but with less than two-thirds of the stockholders present. The court holds that all the law of the state taken together indicates that the Legislature had in contemplation the control of the business interests of a corporation by a majority of the shares held, and that this statute must be construed to conform to that legislative expression, concluding:

"It would seem that the court ought not to impute to the Legislature the folly of providing that a majority of the stock should be necessary to elect a trustee, and that a minority of such stock would have authority to remove the same trustee. Under such construction, three men, representing $50,000, could elect a trustee, and six men, representing $10,000 in the aggregate, could remove him. While it is true, as argued by appellants, that hardships which are imposed by law are not to be considered by the court, because the

policy of the law belongs exclusively to the legislative department, yet the court will be justified in considering the incongruities of the act, for the purpose of determining the intention of the legislative department."

See, also, Grays v. Turnpike Co., 25 Va. 578, 582; Mower v. Staples, 32 Minn. 284, 288, 20 N. W. 225; Weinburgh v. Union Street Railway Advertising Co., 55 N. J. Eq. 640, 37 Atl. 1026. In the last case the Vice Chancellor uses this language:

"And taking into consideration also the general and recognized understanding as to the control of private business corporations by the majority in interest rather than the majority in number of the stockholders, and the injurious results of committing to the control of a minority of stockholders the regulation of its affairs in matters usually controlled by a majority, unless the by-laws clearly give such control, the construction I have adopted seems to me to be the reasonable construction, in the absence of anything indicating that, in adopting these words, the stockholders clearly had in view the majority in number as distinct from the majority in interest of the stockholders."

We should notice the objection made that the act of assenting to the amendment of regulations is such a corporate act that there is required the formal and specific action of the corporation, and that in this case no such action on the part of the plaintiff is shown. The assent to the change was made in behalf of plaintiff by Charles A. Frueauff, who exhibits to the record, not only a proxy duly authenticated by the officers of the plaintiff, but a power of attorney so executed, clothing him with authority in substantially specific terms to do what he attempted to do. There is nothing in the record to indicate that this power of attorney was not the result of some formal consideration by the board of directors of plaintiff; but, even if it were not, we do not regard the action taken of such necessarily primary and substantial character as part of the plaintiff's corporate business that its executive officers could not without formal action perform it, and, if they were here in person, could not so act for the plaintiff. This use made of plaintiff's stock was of the nature of plaintiff's ordinary business, necessarily incident to the purposes of its ·charter; it was not some extraordinary act of the corporation, which needed the specific action of the corporate body to authorize it. Such use as this is but a common incident of ownership. It seems to the court that the power of attorney which Mr. Frueauff exhibited is sufficient to give him the authority of the executive officers of the company. In our opinion, the amended regulations notified to the secretary April 8, 1913, as assented to by the plaintiff, so far as such amendments did not exceed the limits of section 8704, and were not matters of legislation beyond the powers of stockholders, were legally adopted. As we have indicated, the provisions for removal of officers, other than directors and employés, by stockholders, and of directors arbitrarily by stockholders, are contrary to law. They may be excised from the amended regulations without impairing the validity of those amendments which are within the power of stockholders to make.

But it is urged that the revised regulations are not in harmony with the law of Ohio, because they provide for but five days' notice of spe-

cial meetings, and sections 8640 and 8647 are cited. In our judgment, neither of those sections is in point. The first is that allowing demand for inspectors, if made before a court "within fifteen days" before any meeting at which action is to be taken. That is not equivalent to the allowance of 15 days for the making of a demand, to the end that at least 15 days' notice of every special meeting is necessary. The old regulations provided for but a 10 days' notice, which is as much in conflict with the provision referred to of section 8740 as the shorter time in the amendment. Section 8647 provides that, when notice of a special meeting and election of directors is attempted to be made by publication, the latter must continue for 10 days. This obviously does not apply, because no notice was attempted by publication.

Attention is again called to that provision of section 8704 which gives the stockholders power to fix the time, place, and manner of calling and conducting its meetings. Both the old and new regulations stipulate that meetings should be called on notice by mail. The amendment in the particular under consideration seems well within this statute, and no complaint has been made by any stockholder of insufficient notice. Our conclusion is, therefore, that the meeting of April 14, 1913, was regularly called, with power not only to fill the vacancies on the board temporarily occupied by Messrs. Allen, Effler, and Hodge, but to elect 12 additional directors to conform to the change in the regulations which might be done immediately. In re Griffing Iron Co., 63 N. J. Law, 168, 41 Atl. 931; Gold Bluff Co. v. Whitlock, 75 Conn. 669, 55 Atl. 175. The board of directors, therefore, since April 14th, has consisted of the following named persons: Coates, Secor, Hafer, Meilink, Weil, Swift, Fuller, T. H. Tracy, Charles A. Frueauff, Hofman, Logan, Chapman, Welles, Derge, Caughling, Isenberg, Miller, Bump, Williams, F. W. Frueauff, and Newbegin.

The regulations were changed, also, to provide that there should be held a meeting of board of directors immediately after every regular or special meeting of the stockholders. Advantage may be seen in a provision of this effect, and its making appears to be within sections 8701, 8703, and 8704 of the Ohio Code. Acting under it, immediately after the stockholders' meeting of April 14 one of directors was held, whereat were present 13 of those held in this opinion to be entitled to such position. The 5 gentlemen remaining from the old organization were not present; but, the meeting being a stated one, pursuant to the amended regulations, special notice to them was unnecessary. This meeting unanimously elected Mr. Coates president. This was the only action taken which can stand. The office of president was vacant, from the fact that Mr. Allen ceased to be eligible to hold it when the directorship he was temporarily occupying was filled by another. Section 8664, General Code of Ohio. The other offices were not vacant, for the reason already given; consequently the attempt to elect new occupants was ineffective.

The officers of the Local Company at the commencement of this action, therefore, were Coates, president, Hafer, vice president, Beilstein, general manager, Swift, secretary, and Carr, treasurer. It fol-

lows, also, that the attempt of the stockholders' meeting of April 14 to vacate the retainer and engagement of Barton Smith and Smith & Baker as counsel for the Local Company was ineffective. Employment and discharge of counsel involve the exercise of a corporate power, which is vested altogether in the board of directors in Ohio. Section 8660, General Code.

It is therefore held that this action should fail as against defendants Beilstein, Hafer, and Swift, respecting the exercise of their various offices, and against Barton Smith and the firm of Smith & Baker, touching their employment as counsel for the Local Company. However, a temporary injunction should issue restraining each of the defendants to this complaint from in any wise interfering with the exercise of the office of director by Fuller, T. H. Tracy, Charles A. Frueauff, Logan, Chapman, Welles, Derge, Caughling, Isenberg, Miller, Bump, Williams, F. W. Frueauff, and Newbegin, and of president by Mr. Coates, if plaintiff has the capacity to bring this action at all, and if the facts in evidence clothe this court with equitable jurisdiction, both of which propositions are vigorously combated.

We have no doubt of the court's power, other considerations being propitious, to afford less relief than that demanded, and that we are not limited, as was insisted in argument, to granting exactly in quality and quantity the relief prayed for or dismissing the bill. The pleading very carefully sets out the exact directorship to which each of plaintiff's claimants is elected, and the consideration which sustains plaintiff's right to sue at all requires that it obtain relief as far as circumstances warrant, even if that falls short of its demands.

We will first consider the right of the plaintiff to sue; it not having either asked that the Local Company, of which it is a stockholder, protect its rights, or in suing made the Toledo Railways & Light Company a party. We are first invited to a consideration of equity rule 27 (old rule 94 [198 Fed. xxv, 115 C. C. A. xxv]), which reads:

"Every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share had devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a cause of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees and, if necessary, of the shareholders, and the causes of his failure to obtain such action or the reasons for not making such effort."

[6] It is urged that the bill fails to comply with this rule, and is, consequently, on that account demurrable, or, since the adoption of the new rules, subject to motion (Illinois Central v. Adams, 180 U. S. 28, 34, 21 Sup. Ct. 251, 45 L. Ed. 410), wherefore it is insufficient to warrant a temporary injunction. The hearing was upon answer of the eight defendant directors, and without raising the application of this rule until upon oral argument after two weeks of testimony. Whether or not the rule applied to the facts set out in the bill (the court is of the opinion that it did not apply, for the reason that the action is not against the corporation of which plaintiff is a stock-

holder), it clearly does not pertain to a situation such as the facts disclose is here. It applies by its terms to cases wherein the corporation is a necessary party, and we do not readily see how on any theory, on the facts before us, either in the bill or in evidence, the Toledo Railways & Light Company is a necessary party. It is not a party to the Doherty contract, nor has it an interest in trying the title to office of one claiming to be an officer in itself. Neither could the company commence an action to compel certain of its officers and directors to allow others in those relations to exercise their official functions, and that is the situation on the facts at which we have arrived. Besides, plaintiff also sues in the capacity of holder of nearly all of the Local Company's bonds in the extraordinary sum of $11,000,000, and bondholders' actions are not covered by the rule at all. The action is manifestly as much in plaintiff's interest as a bondholder as a stockholder.

The right of one interested in a corporation as a bondholder, stockholder, creditor, or contractor to maintain an action in the federal court to protect his interests in the corporation, without joining in his action the corporation itself or other parties in substantially the same interest as complainant, has been sustained in a variety of instances wherein the circumstances were unique, and where to deny such right would produce injustice and injury. Some instances are: Carter v. Fortney (C. C.) 170 Fed. 463; Carroll v. C. & O. Coal Agency Co., 124 Fed. 305, 61 C. C. A. 49; Hubbard v. Railway, 200 Fed. 505, 118 C. C. A. 608; Mercantile Co. v. Texas Railway Co. (C. C.) 51 Fed. 529; Ex parte Haggerty (C. C.) 124 Fed. 442; Putnam v. Dry Goods Co. (C. C.) 79 Fed. 454; Hotel Co. v. Wade, 97 U. S. 13, 24 L. Ed. 917. In the last case Justice Clifford, for the court, said:

"It is true, beyond doubt, that all persons materially interested in the fund to be distributed should be made parties to the litigation; but this rule, like all general rules, will yield whenever it becomes necessary that it should be modified in order to accomplish the ends of justice. Authorities everywhere agree that exceptions exist to the general rule; and this court decided that the general rule will yield if the court is able to proceed to a decree and do justice to the parties before the court, without injury to others not made parties, who are equally interested in the litigation."

[7] We are now to that argument which asserts want of jurisdiction in this court because a remedy at law, as quo warranto, exists to test the title of plaintiff's directors to the seats they claim. In the first place, the statutes of Ohio do not award an action in quo warranto as a matter of right on demand of a party claiming an interest, but devolve upon either the Governor, Supreme Court, General Assembly, Attorney General, or prosecuting attorney the initiative for such an action when title to a private office is in question. Sections 12,305, 12,306 and 12,307, General Code. It would seem to us that the remedy by quo warranto is therefore not quite complete, where the party interested must appeal to the discretion of some other person or body. Besides, section 12,342, General Code of Ohio, provides:

"Nothing in this chapter [chapter relating to quo warranto] shall restrain a court from enforcing the performance of trusts for charitable purposes, at the relation of the prosecuting attorney of the proper county, or from en-

forcing trusts, or restraining abuses, in other corporations at the suit of a person injured."

It would appear, then, that the remedy by quo warranto in this state, instead of being exclusive under circumstances such as are here, is cumulative. Besides, the remedy at law, to exclude jurisdiction in equity, must be adequate. The Supreme Court, in Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 12, 19 Sup. Ct. 77, 82 (43 L. Ed. 431), announced the rule as follows:

"This court has repeatedly declared in affirmance of the generally accepted proposition that the remedy at law, in order to exclude a concurrent remedy in equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration as the remedy in equity. * * * Where irreparable injury is threatened, or the damage be of such a nature that it cannot be adequately compensated by an action at law, or is such as, from its continuance, to occasion a constantly recurring grievance, the party is not ousted of his remedy by injunction."

It is obvious, from what already has been said and may hereafter be said of the situation obtaining at the time this suit was commenced, that the slow processes of law, at the end of which plaintiff's directors might have been seated, would have left much opportunity for irreparable injury to plaintiff's interests.

The court is exercising no judgment as to the value of the Contract. We accept the assurance of all parties, including Mr. Smith, of its very great value and beneficence. We have hitherto suggested that as the breath of life to it was the necessity for absolute harmony between the Operator, Doherty & Co., and the board of directors of the Local Company, which latter body only could legally control. This necessity for a harmonious board in a project of this magnitude no sensible business man would leave to chance, or to a sense of fair dealing merely among gentlemen, whose differences of opinion might disturb relations. It must be secured, and we pay no mere compliment to the Bondholders' Committee or to the Stockholders' Committee and their counsel in stating a belief that they devised a holding company in the Plan to that end, which, as the plain import of the language of all the agreements, was to have the powers claimed by plaintiff.

The plaintiff is organized as a corporation subsidiary to Doherty & Co., with sole relation to the firm's operation in Toledo. Its stock is held by a voting trust, which, in turn, is controlled by Doherty & Co., and its officers and board of directors are members or employés of that firm. Funds had to be raised for rehabilitating the plant in Toledo, for which $1,500,000 were appropriated (contracts already having been entered into for electrical machinery involving about $400,000). Provision had to be made to pay the Local Company's floating indebtedness in an amount of more than $2,000,000, and a heavy bonded indebtedness, with large defaulted interest, had to be satisfactorily taken care of, for foreclosure proceedings, already having been commenced, meant ruin to the stockholders. All these situations were to be met through marketing the securities of plaintiff, and it is very obvious that a market therefor depended wholly upon the character of plaintiff's relation to the Local Company. If it could not have the voice in the latter's affairs which would ordinarily come

to a shareholder or bondholder of its magnitude, then its power to make its own securities good, based as they were on the local securities, which in turn depended for value largely on the management of the Local Company, would enjoy little confidence, to the very great depreciation of its issue of bonds and stocks. No other way occurs to the court to meet the problems involved, except through a corporation of plaintiff's powers. The plaintiff, however, was confronted on the 3d of April, and continuously to the bringing of this action, with a board of directors in the Local Company thoroughly. hostile to it, and resolved that it should have no voice in the company's affairs whatever, and that, too, at the very time when it was in the market to obtain by sale of its bonds money to do the things which the Contract required of its principal, Doherty & Co. To say, therefore, that an adequate remedy is found in quo warranto, with its attendant delays incident to a legal procedure, a proceeding burdened with the requirement that the discretion of some public officer or body must be first favorably appealed to, is not sensible.

Our judgment is that the unique situation here well filled all the requirements of a proper appeal to equitable jurisdiction, and that the unpleasant task of depicting it cannot be avoided. This disagreeable duty involves an analysis of the attitude toward plaintiff, subsequent to February 12, of Barton Smith, counsel for the Local Company and some of its forbears for 20 years, and counsel for the Stockholders' Protective Committee all through the negotiations resulting in the formation of the Plan and the transactions to bring it to the point where it could be declared operative. During the many conferences through the four months preceding February 12 the evidence shows him to have been the assiduous and careful conservator of the interests of his committee and the Local Company, scrutinizing most watchfully all the proposals, documents, and plans dealing with the difficulties and ambitions in hand. That he was conversant, or should have been, with just exactly what was on foot respecting the Local Company and his committee, that is to say, his clients, and as plaintiff's charter powers might affect them, is the compelling conclusion of even his own testimony. That he may have been the victim of unfair dealing and of secret machinations against him affecting his private interests is possible; but that the court is not called upon to decide. All the documents and contracts which reached final settlement, and from which only all rights and powers claimed to be enjoyed by any party connected with the situation, including plaintiff, are deduced, passed under his amending inspection. The most complicated documents were in printed form, and the evidence shows Mr. Smith to have been furnished with preliminary printed proofs of each for his suggestion and consideration.

We have quoted hitherto expressions foreshadowing the organization of such a "New Company" as plaintiff, which were found in the published Plan and in the letter to the stockholders, edited by Mr. Smith, and sent by his committee, advising acceptance. These documents were perfected and published by the middle of November. While the Plan was in process of devising, or early in October, according to his admission, Mr. Smith had a proof of a proposed in-

denture which should be executed by the proposed New Company, whose incorporation it was agreed should be in some other state than Ohio. A copy of this proof is in evidence, and contains provisions unmistakably showing an intention that this proposed holding company should own and vote the stock of the Local Company. This seems to the court also to be the necessary deduction from certain provisions of the ninth, tenth, and twelfth paragraphs of another document in evidence, which was bound into the pamphlet containing the Plan, and which is called the "Agreement of Reorganization," which unquestionably Mr. Smith saw before issuing the letter to the stockholders.

February 11, the various committees and their counsel met in New York, and, gathering up the threads of detail, declared the Plan operative. At this time, the plaintiff company had been incorporated for 12 days. It probably is true that Mr. Smith had not then seen its charter, but it had then executed two trust indentures to secure the first and second lien collateral trust notes, as they are denominated in the Plan. These documents are identical in the provisions to be hereinafter alluded to, save as they apply to different issues of securities and are expansions of the preliminary proofs which were in Mr. Smith's hands in October. Referring to the paging of the indenture appropriate to the second lien notes, we find these provisions: (1) That, among other securities, plaintiff's present and after-acquired holdings of stock in the Local Company are to be deposited in pledge for the payment of the obligations issued by it. (Pages 9 and 18.) (2) *That plaintiff will hold at all times a controlling interest in the Local Company and will use such interest to secure the election of suitable directors and officers and will thereby undertake to supervise. the business of the Local Company.* (Page 19, section 5; page 21.) (3) That plaintiff, until default is made, *reserves the right to vote the stock* of the Local Company. (Page 34.) In these are found all the powers which the plaintiff is asserting in this action.

Having declared the Plan operative, the Reorganization Committee, which was charged with the duty of paying the expenses of the various committees, including counsel fees, and acting upon a resolution unanimously adopted by the Stockholders' Committee, of which Mr. Smith was counsel, authorized the issuing of checks to the several members of that committee and Mr. Smith, in payment of the fees, compensation, and expenses agreed upon by that committee's resolution. These checks, issued on the 11th, for reasons which afterwards appeared to Mr. Smith to be insincere, but which, in the court's judgment, in the light of all the evidence, were entirely justifiable, were postdated to the 14th. All the work having been accomplished, as far as the powers of these purely voluntary committees were concerned, which assumed to act as guardians for the Local Company because of their supreme interest in it, Mr. Smith, on the eve of his departure for Toledo, February 12, addressed to Mr. Miller, counsel for the Bondholders' Committee and for the Reorganization Committee and also the latter's secretary, the following letter:

"I have again gone over the draft of February 8, 1913, of the indenture securing the second lien bonds, and have no further suggestions to make. It

seems to me that the difficulties have been fairly met and the solutions justly provide for the contingencies so far as we are now able to foresee them. My understanding is that February 27th I am to turn over all the Toledo companies absolutely to Doherty & Co.

"Sincerely,                    Barton Smith."

The "indenture securing the second lien bonds," referred to in this letter, is the identical instrument by which the plaintiff secured its issue of $1,200,000 second lien collateral trust notes referred to above. Regarding the statement of this letter and the matters of the documents just alluded to and many admissions of detailed knowledge made by him on the stand, the court has no alternative but to assume that Mr. Smith had full knowledge, prior to February 13, of all the powers which plaintiff claimed for itself and that he was in the attitude of promise to assist in the carrying out of such powers. It is assuming too much that we should decide against all of this evidence that he who had been for twenty years intimately and professionally connected with traction and public utility affairs of this city, and who had been through all the reorganization negotiations counsel to an essential committee and assiduous in scrutinizing and editing the many documents bearing upon the business in hand, should not have appreciated the full force of their provisions. There is no way known to the court by which he could "turn over all the Toledo companies absolutely to Doherty & Co.," except by permitting the Plan to work to the securing of a harmonious board of directors. To assure the continuance of such a situation it was essential that the Doherty agencies (in this instance, the plaintiff) should be in position to name directors.

It should at this time be noted that Doherty & Co. had no interest or part in the arrangement of compensation for Mr. Smith and the members of his committee. The firm was to pay into the hands of the Reorganization Committee large sums of money, the disbursement of which, however, was wholly without its control and a matter indifferent to it. This seems to be conceded by Mr. Smith; however, the force of the evidence is clear that the Doherty firm was not concerned in the disposition of the funds which it was to pay in, nor could any legitimate effect come to its operating contract, whatever turmoil might ensue over the division of fees and compensation.

February 13, Mr. Smith then being in Toledo, Dr. Netherland, a member of the Stockholders' Committee, and who had assented to the division of fees and compensation among the members of his committee and to Mr. Smith, attempted to repudiate the agreement and brought an attachment suit against the Committee in New York. This led Miller to stop the payment of the latter's checks, notifying Mr. Smith by wire. Mr. Smith's first action was to telegraph to Doherty in this language:

"Miller telegraphed that because of a suit brought by Dr. Netherland he has stopped the payment of checks issued by him for the Reorganization Committee. Please make no further payments to Reorganization Committee, as possession of street railway property cannot be delivered if Miller breaks understanding and asserts that the funds of the Stockholders' Committee remain in the hands of the Reorganization Committee after his checks were issued to the individuals who received them."

Doubtless this message was hastily written, under the influence of a hot impression that he had been tricked by Mr. Miller, against whom he manifested on the stand considerable feeling, which is also marked in his correspondence; but we cannot interpret it in any other way than as conveying a threat that Miller's action, unless repaired by Doherty, would disarrange the latter's plan. To say that "possession of the street railway property cannot be delivered" (to Doherty & Co., of course) "if Miller breaks understanding" (which, it is clear, Doherty was neither a party to nor had an interest in, as the Contract in no way involved the subsequent dealings of Miller's committee with Mr. Smith and the Stockholders' Committee) seems to convey nothing less than an intention to compel this outsider to assist the ultimate payment of the check. Nor does Mr. Smith's testimony on the stand, giving the three reasons impelling this telegram, serve to modify this interpretation. They were, in substance, that his relations with Doherty & Co. justified a demand for the latter's help; that the firm had considerable money yet to turn over, which it was desired should be stopped until the dispute was settled; and, finally, that the business going on in New York might be halted until he (Smith) could investigate and consult with the Stockholders' Protective Committee. As late as March 10, in a long letter to Mr. Doherty in person, giving an opinion upon the law of Ohio which, in Mr. Smith's judgment, affected the situation, he lays down three conditions of adjustment which he insisted upon and which he deemed "not open to question." The first condition was:

"That I may carry on the litigation which Mr. Miller's malice has forced upon the owners of the checks issued by the Reorganization Committee on February 11th with as little scandal and publicity as possible."

How that could be a legitimate condition precedent to Mr. Doherty's firm entering upon the execution of its contract in the operation of the local utilities was not made apparent by anything which appeared in the testimony. The four gentlemen elected by the board February 8 to fill the vacancies were confessedly makeweights to occupy temporarily the places until reorganization plans should bring in the new operative. One of them was an occupant of Mr. Smith's offices, one was the company's secretary, and two were employés of the company. These last two, in writing, dated February 14 tendered their resignations. These were accepted February 27, when the vacancies were filled by the election of two young attorneys of Mr. Smith's office force, one of them being his son-in-law. Undoubtedly, the personnel at that time and subsequently was such that a clear majority was subservient to Mr. Smith's every wish, with whom he would be able to work to execute his promise to turn the company over to Doherty & Co. To say that Messrs. Allen, Effler, Houge, Swift, and Weil would not do what he advised is to talk nonsense. They had qualified for their respective positions through his help to stock, one share to each, some of them receiving their solitary shares as gifts, and they were all so related to him in various ways that his wishes were bound to control. Three of the four remaining directors were friends and clients of Mr. Smith, and were on the board largely in consequence; one of

them held a solitary qualifying share, and the other two but 28 shares together in personal or partnership interest. The ninth director, Mr. Coates, owned but one share—curiously enough, a gift of Mr. Smith. So that this board altogether represented 35 shares of stock out of 138,750 shares outstanding, and against the 117,447 shares held by the plaintiff.

Manifestly, it was but a temporary body, or one holding for some particular interest, and that that interest Mr. Smith represented in its formation is altogether plain. To call it, then, the "Smith board" is no mere figure. It states succinctly the situation. However, there is no reflection, simply in that fact alone, upon either Mr. Smith or the individual members. It was part of the general understanding that a subservient board should be secured; the members severally knew or should have known it; and but the wishes of all parties to the negotiations, including Doherty & Co., were therein carried out. So-called boards of "dummy" directors are neither uncommon nor necessarily reprehensible factors of corporation procedure. They are common temporary expedients. The plaintiff, in attempting to choose for the Local Company its board, followed the same plan to an even greater length; for, as it has more directors, it has more "dummies." The use of a "dummy" board, however, may become censurable, and that is the height to which mount the charges against Mr. Smith and his codefendants in this particular in this case.

Confessedly for the accommodation of Doherty & Co., the election of officers, which should have taken place in January, was postponed from time to time. The contractor wished to have time for auditing, checking up, and other adjustments. During this time contracts for large machinery expenditures were let, after consulting with and the approval of Doherty & Co., and that firm's wishes seem to have been considered in other important particulars. None of these acts, however, nor their aggregate effect, including the action by the board of the Local Company of February 8, in which was ratified the provisions of the Plan so far as they affected the disposition of the floating liabilities, reached to making the Local Company a party to the contract. It is a matter of doubt whether the directors of the Toledo Railways & Light Company could formally enter into such a contract. The board could not abdicate its functions. All that could be done would be to have a friendly directorate, which would be the legal operative of the Local Company and the executor of its charter powers, with a situation little more than a legal fiction—the New York firm in actual control.

During this period, also, the correspondence between Mr. Smith and Doherty and other New York parties continued and increased in strenuosity. In time his fears began to develop for the legality of the Plan in two particulars: First, that which involved the employment at Toledo by Doherty & Co. of a New York corporation which it controlled. This was the Doherty Operating Company. The evidence shows it to have been wholly subsidiary to the firm, and organized as the latter's department for operating public utilities, especially in relation to engineering and kindred problems. The probable use

of some such agency as this seems to have been involved in the Contract from the first. This agreement, with which Mr. Smith was entirely familiar, is in terms with Doherty & Co. "for themselves and *any operating organizations or corporations controlled by or associated with them,* party of the second part." Given that the Contract itself was lawful to be executed in Ohio, we are unable to find any legal reason why the partnership of Doherty & Co., bound as Contractor, might not employ a foreign incorporated agency to assist its work. The other apprehension related to the connection plaintiff as a foreign corporation was claiming with local affairs.

The evidence does not disclose that either of these fears came to Mr. Smith prior to February 27, when he hinted at legal difficulties in a letter to Harris, Forbes & Co., brokers undertaking to float the new securities. Neither does any fact appear in evidence as coming to light after Mr. Smith's approbative letter to Miller of February 12, respecting these questions, which is anything more than an obvious detail of the plain provisions of the several agreements and indentures executed and under full scrutiny before that time, except that in a descriptive circular issued by Harris, Forbes & Co., to promote a market for the securities, it was said that the Contract to operate the local utilities had been made with the Doherty Operating Company. Mr. Smith will not believe that this statement was an inadvertence. Whether or not it was such, it was untrue, and the publishing of it did not in the least affect the responsibility of Doherty & Co., the actual party to the Contract. Whether the fears based upon the relation attempted to the Local Company by the plaintiff have substance in law is to be considered later. It is sufficient at this time to note that all the facts fundamental to the legal questions were prominent in all the transactions from the first. If the Plan is to come to naught because of them, it is pitiable that their baneful possibilities were not sooner apprehended.

It seemed from his own testimony that Mr. Smith's dislike and distrust for Mr. Miller, the counsel for the other committee, antedated the reorganization negotiations. Much of this attached to Mr. Coates, the president and general manager of the Local Company, whom Mr. Smith appeared to regard as Miller's protégé and against whom he exhibited a feeling when on the stand. Mr. Coates is an engineer and street railway man, professionally educated and of about 20 years' practical experience, and had held the local executive position for about 16 months prior to April 3. The only reflection upon his ability in that capacity came from Mr. Smith. During the reorganization negotiations, at least before February 12, Mr. Smith suggested to Doherty & Co. the propriety of displacing Mr. Coates, but he was told that the firm wanted an opportunity to judge the manager's suitability by actual experience. On Mr. Coates' staff was Mr. Miller's brother, T. Lee Miller, also decidedly obnoxious to Mr. Smith, who finally became so apprehensive of the supposed machinations of the Miller influence in local affairs that he feared even to go to New York, telegraphing Mr. Doherty under date of March 9:

"My strong opinion is that the Miller element here should be eliminated at once, and that afterward we should take up carefully the solution of our

difficult problems. There is no solution possible which includes the continued operation under Miller's orders. I do not feel safe to leave here with Miller in full control of company, but will come to New York at any time you wish after the interests of the Rail-Light Company are in safe hands. If you insist, election of officers will be postponed until Thursday; but I cannot go to New York until after the election."

By the expression "Miller in full control of company" Mr. Smith undoubtedly meant the continuance of Mr. Coates in the office of president and general manager. He positively refused to permit the election of officers to be postponed beyond April 3, consenting to that late date only to permit a member of the Doherty firm to be present. On that occasion, one of the partners was permitted to proffer the requests of his firm to the board. The first was that the election of officers be further postponed until the reports of experts lately examining the properties could be checked up; or, second, if an election must take place immediately, that the old officers, including' Mr. Coates, be retained until Doherty & Co. could know by experience whether they severally suited conditions. No one can say that this last request was unreasonable, or that it failed to comport with ordinary business prudence. But, although the New York firm had undertaken great responsibilities, in behalf of which it was already under heavy expenditure, and had taken a contract for the successful management of these utilities which had Mr. Smith's approval, its request was refused, undoubtedly at Mr. Smith's dictation, and Mr. Coates was deposed for the elevation of Mr. Smith's son-in-law as president. The record of testimony may be searched in vain for any real explanation of this, except dislike for Mr. Coates. Mr. Smith does say that it was through fear that Coates would have dealings with the Doherty Operating Company; but he also says that, for its acquiescence in the deposition of Mr. Coates, he agreed to permit, in behalf of Doherty & Co., that Frank W. Frueauff should be made chairman of the board, a position of greater authority than president, and Mr. Bump manager, although both of these gentlemen were executive officers of the Doherty Operating Company and as likely, for all that appears, to deal with their own corporation as Mr. Coates.

We must not be understood as indorsing the charge of the bill that Mr. Smith was using his command of the Local Company's directorate to compel Doherty & Co. to help him get his check cashed. Undoubtedly the dishonoring of the check precipitated the crisis. Had it not happened, it seems plain that February 27 Mr. Smith would have passed over control to Doherty & Co. He soon calmed down to the opinion, which the court also holds, that his fees represented by the check are safe, and that there can be no defense to the latter's ultimate payment. But the check incident was fuel to the smoldering embers of his dislike for Miller and Coates, which, making him suspicious of every untoward and misunderstood circumstance, flamed into a resolution that his way should prevail. To this effect only does the court find the evidence supporting the complaint in this particular. Even at the hearing, Mr. Smith assumed a readiness to permit the Doherty people to name officers for the Local Company, provided he re-

tained a veto for Coates or one thought by him to be under the Miller influence.

Doherty & Co. faced, then, an issue which centered around the personality of Mr. Smith and the intensity of his feelings; to him in this matter Doherty & Co. should bend, and, until his feelings were considered, the beneficent plan and the beneficent contract under it should halt operation. If Doherty & Co. were to encounter obstacles of this character in the progress of their work, it was the part of but ordinary judgment for the firm to force the issue to determination at the earliest moment. The facts leading to this situation did not, as insisted in argument, estop Mr. Smith and the other defendants from objecting to the consummation of the plan through the agency of plaintiff or of the Doherty Operating Company, on the theory that the offices of these corporations violated some law of Ohio, for the two very obvious reasons that estoppel cannot be invoked to sustain an attempt to an illegal action, and that Mr. Smith could not by any assent bind his client, a corporation, to an illegal action. But the attitude toward plaintiff which the Local Company, through Mr. Smith's inspiration, occupied from April 3 to the beginning of this action serves to clothe a court of equity with power to act.

The contest is between the eight Smith directors, representing less than .03 of 1 per cent. of the company's stock, which is of itself of but little value, and the plaintiff, with more than four-fifths of the stock and millions of bonds. During the progress of an action at law, the latter would be compelled to suffer the property basis of its securities to be administered by its enemies, and that, too, at the very time when it was seeking a market for its own issues, which have no value save as its holdings in the Local Company are conserved. Such a condition ought to sustain jurisdiction in equity even in a case involving a private corporation, although the large issue was that of title to office, and a much greater demand is there for equity to consider that the legal remedy fails when such a public corporation as the Toledo Railways & Light Company is concerned, one that through its various activities touches so vitally the comforts of the homes and the prosperity of the business of a great city.

In conditions such as these "a court of equity that would hesitate * * * would be of little use." Johnston v. Jones, 23 N. J. Eq. 216. In cases where the determination of title to office is incidental to protection of interests of shareholders or bondholders, injunction may be resorted to. Johnston v. Jones, supra; High on Injunctions (4th Ed.) § 1235. It is not unknown to the Ohio practice to resort to equity to recover possession of corporate property when the contest is between rival boards of directors. Bartholomew v. Lutheran Congregation, 35 Ohio St. 567.

These considerations entered controllingly into the court's action in granting without notice a temporary restraining order. Nothing appearing in testimony has weakened the legitimate appeal of the plaintiff's averments for such an order, except as to the extent to which it should have gone. Again, the court was dealing with a situation like unto nothing but itself. The judge is not always called upon to ignore

the knowledge or the impressions that are incident to his citizenship, or which may come to one of moderate experience or observation. The contending interests were in the ratio of relative importance, measured by their shareholding, of 1 to more than 300, and, measured by interests in the company's affairs, much more disproportionate. The sudden and unreasonable displacement of an executive tempered by age and experience in handling men for a young man who, however excellent his professional attainments or amiable his character, clearly had never had an opportunity to acquire the facility which only experience ripens to handle or even counsel the solution of problems daily arising in the varied activities of the company, was not calculated to preserve the morale of the force employed or to maintain confidence that the inevitable frictions of each day's operation would be reasonably adjusted. Nor was this weakness fully supplemented by a reversal of the recent policy of the company in the separation of the office of president and general manager. Unified control, while this case pended on hearing of either a motion for temporary restraining order or a temporary injunction, if either course happened to take several weeks, as it must, was essential, and that did not obtain when the suit was begun. In the court's judgment, that control which represented the overwhelmingly larger interest was preferable, especially as it brought back an executive to which the employés had lately and for a long time been accustomed. The court was sensible then, as upon the full hearing, that a personal element was the predominant influence halting a management of these interests so vital to the community—a management which had the indorsement even of those who blocked its assumption.

[8] We now come to the final question: Does permission to the plaintiff to exercise the powers of a stockholder to the full extent enjoyed by a natural person violate section 76 of the Ohio Public Utilities Act (section 614—73, General Code of Ohio), which reads:

"No franchise, permit, license or right to own, operate, manage or control any public utility, herein defined as an electric light company, gas company, water works company or heating and cooling company, shall be hereafter granted or transferred to any corporation not duly incorporated under the laws of Ohio."

The precise question was before the Attorney General of Ohio when called upon by the Public Service Commission December 12 last for an official opinion upon a case where a foreign corporation had acquired and was exercising the full rights as owner of a majority of the stock of the Coshocton Light & Heating Company. Attorney General Hogan's opinion in part is as follows:

"The most that can be said of the letter quoted is that it possibly shows that the foreign corporation became directly or indirectly the owner of a controlling interest of the Coshocton Company's stock, but it nowhere appears that the foreign company has acquired by transfer or otherwise the '*franchise, permit, license, or right to own, operate, manage, or control*' of the Coshocton Company as a corporation. These words and this whole section refer to the *corporation itself*—the statutory creature under the Ohio laws— not to stock therein held or owned by any one. This section cited seeks to prevent the granting to a foreign corporation of the franchise, permit, license, etc., giving corporate powers to the class of utilities therein mentioned, and

also to prevent the transfer of these corporate powers and privileges in such utilities to foreign corporations by the domestic corporations to which they were originally granted. The Coshocton Company is to all effects and purposes still an Ohio corporation, with all its powers, franchises, etc., intact; but the majority of the stock may be owned by outside parties and controlled by the foreign corporation. Under this state of facts there is no violation of section 76, and there can be no relief until the Legislature enlarges the provisions of this section to cover such cases as contemplated in the communication."

With this, the only construction so far by an Ohio authority of this Ohio law, we wholly agree. Plaintiff is not demanding that there be transferred to it any franchise, permit, license, or right enjoyed by the Local Company. These responsibilities and privileges are to continue to be borne and enjoyed by the Toledo Railways & Light Company, an Ohio corporation, and its activities will continue to be directed by its directors, a majority of whom must be residents of Ohio, and in whom alone is the control of the company. Section 8660, General Code of Ohio. To be sure, indirect control of the Local Company may be in plaintiff, because of its predominating influence as a majority stockholder, just as it might be indirectly in a single natural person owning a majority of the stock. If there is mischief to be found in this situation, such mischief is in a different class from that against which the act quoted above is directed. This law is to secure that the management of Ohio public utilities of the classes described shall be subject exclusively to Ohio legislation and amenable altogether to Ohio courts. That result of the law would be unimpaired, even if plaintiff chooses all the directors for the Local Company; for, in its management, under such assumed control by the foreign corporation, the Local Company would still be the creature of and subject to Ohio legislation, and the object, unaffected, of any proper consideration by Ohio courts. It is the Toledo Railways & Light Company nevertheless which controls and operates the franchises of the heating, lighting, and gas plants of the city. Owning a majority of the stock in a company is not legal control of that company, within either the meaning or spirit of this statute, having special reference to the palpable object of its enactment. Section 8660, General Code of Ohio; People v. Bell Telephone Co., 117 N. Y. 241, 22 N. E. 1057; Stone v. Railway, 202 N. Y. 352, 95 N. E. 816, 35 L. R. A. (N. S.) 770; Pullman Co. v. Railway, 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499.

A temporary injunction may issue, as indicated in this opinion.