HENRY M. STONE et al., Respondents, v. THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY, Appellant, Impleaded with Another.

Railroad corporations — when ownership of majority of stock of one railroad company by another does not make the controlling company liable for the default or negligence of the subordinate company.

1. It is well established that the ownership of a majority of the stock of a corporation, while it gives a certain control of the corporation, does not give that control of corporate transactions which makes the holder of the stock responsible therefor.

2. A railroad corporation is not responsible for the ordinary daily operations of another, when it appears that the first owns a majority of the capital stock of the latter and thereby controls its corporate organization, which, however, remains legally distinct and separate, and by reason of such stock control or other influence has assembled the latter road with others into a transportation "route" or system which is advertised and known by the name of the former road, it further appearing that the subordinate railroad in all respects maintains its corporate identity, makes its own contracts, keeps its own accounts, collects its own revenues and pays its own operating expenses, and that the only financial interest of the controlling road is by way of dividends on its stock.

*Stone* v. *Cleveland, C., C. & St. L. Ry. Co.*, 136 App. Div. 907, reversed.

(Argued May 16, 1911; decided June 13, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 13, 1909, affirming a judgment in favor of plaintiffs entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Thomas D. Powell* for appellant.  The Cleveland, Cincinnati, Chicago and St. Louis Railway Company and the Cincinnati Northern Railroad Company are each a separate and distinct legal entity; there is no evidence in the case from which the jury could find that the Cincinnati Northern Railroad Company was operated or controlled by the Cleveland, Cincinnati, Chicago and St. Louis Railway Company, or that it was a part of the latter's system, and the verdict of the jury is without any evidence to support it. (*Penn. R. R. Co.* v. *Jones,* 155 U. S. 333; *P. P. Car Co.* v. *M. P. Ry. Co.*, 115 U. S. 587; *Peterson* v. *C., R. I. & P. R. R. Co.*, 205 U. S. 364; *A., T. & S. F. R. R. Co.* v. *Cochrane,* 43 Kans. 225; *St. L. S. W. R. Co.* v. *G. C. Co-Op. Grocery Co.*, 70 Ark. 10; *St. L. S. W. R. Co.* v. *Smith,* 71 Ark. 290; *Peabody* v. *Oregon Ry. & Nav. Co.*, 31 Ore. 121; *Plew* v. *M., K. & T. Ry. Co.*, 29 S. W. Rep. 403; *Ferguson* v. *W. C. R.*

*R. Co.*, 63 Wis. 147; *Dunlap* v. *R. & D. R. R. Co.*, 81 Ga. 136; *People* v. *A. B. Tel. Co.*, 117 N. Y. 241.)

*Irving W. Cole* for respondents. Appellant is liable for the negligence shown as the cause of the damage. (*Lehigh Valley R. R. Co.* v. *Delachesa*, 145 Fed. Rep. 617; *Lehigh Valley R. R. Co.* v. *Dupont*, 128 Fed. Rep. 240; *Phelps* v. *Waite*, 30 N. Y. 78; *Strothers* v. *Elting*, 97 N. Y. 102; *Roberts* v. *Johnson*, 58 N. Y. 613; *Wylde* v. *Ry. Co.*, 53 N. Y. 156; *Colgrove* v. *Ry. Co.*, 20 N. Y. 492; *Champion* v. *Boswick*, 18 Wend. 175; *F. L. & T. Co.* v. *N. Y. & N. Ry. Co.*, 150 N. Y. 410; *U. S.* v. *N. S. Co.*, 120 Fed. Rep. 721.) There is ample evidence that the Cincinnati Northern was a part of appellant's system. (*Penn. Co.* v. *Rossett*, 116 Ill. App. 342; *L. V. Ry. Co.* v. *Delachesa*, 145 Fed. Rep. 617; *L. V. Ry. Co.* v. *Dupont*, 128 Fed. Rep. 240.) The jury found upon sufficient evidence that appellant actually operated the Cincinnati Northern at the time of the shipment in question. (*S. A. R. Co.* v. *Graves*, 49 S. W. Rep. 1103; *Nagel* v. *Mo. Pac. R. Co.*, 75 Mo. 653; *Driscoll* v. *N.*, etc., *Co.*, 32 Atl. Rep. 354; *Central Trust Co.* v. *Ry. Co.*, 89 Fed. Rep. 560; *Central Trust Co.* v. *Ry. Co.*, 97 Fed. Rep. 239; *Braslin* v. *Sommerville*, etc., *R. Co.*, 145 Mass. 64; *Pittsburg, C. & St. L. R. Co.* v. *Knutson*, 69 Ill. 103; *Tilley* v. *Coykendall*, 35 Misc. Rep. 164; 172 N. Y. 587; *Werner* v. *Hearst*, 76 App. Div. 475; 177 N. Y. 63; *F. S.*, etc., *Ry. Co.* v. *Fortney*, 32 Pac. Rep. 904; *Penn. R. Co.* v. *Sellers*, 17 Atl. Rep. 987; *U. P. R. Co.* v. *Jones*, 12 Pac. Rep. 516; *A. T.*, etc., *Ry. Co.* v. *Davis*, 8 Pac. Rep. 146; *P., F. W.*, etc., *R. Co.* v. *Callaghan*, 157 Ill. 406; *Ry. Co.* v. *Ry. Co.*, 87 Ind. 441.) The jury found upon sufficient evidence that appellant represented and held itself out to the public and to plaintiffs as the operator of the Cincinnati Northern. (*J. R. Co.* v. *Garrison*, 11 So. Rep. 929; *Union R. Co.* v. *Schaklet*, 10 N. E. Rep. 896; *Commonwealth* v. *Boston R. Co.*, 65 Mass. 512; *Omaha*, etc., *R.*

*Co.* v. *Morgan,* 59 N. W. Rep. 81; *Chicago & E. I. R.
Co.* v. *Schmitz,* 71 N. E. Rep. 1050.)

HISCOCK, J.   Plaintiffs undertook to ship a carload of
horses from Van Wert, Ohio, to Buffalo.  Some of the
horses being injured in transit, they recovered a verdict
for damages against the appellant.  It will be assumed
without consideration that there was sufficient evidence
on which to rest a verdict against some carrier.  The only
question which I shall consider is whether there was any
proof establishing liability on the part of the appellant.

The point of shipment was situated on the Cincinnati
Northern railroad, and at the end of its line the horses
were to be delivered to the New York, Chicago & St.
Louis railroad, which would carry them to the point of
destination.  The horses were received by, and the con-
tract of shipment expressly and exclusively was made
with the former company.  No part of appellant's rail-
road proper was within the shipping route, and it did not
directly or in name have anything to do with the ship-
ment or become a party to the contract therefor.  It is,
however, claimed that indirectly it so controlled and
operated the Cincinnati Northern road as to be responsible
for its transgressions if there were any.

This claim, thus far approved of by the courts, rests on
three lines of evidence, the important portions of which
will be summarized.

Concededly the appellant owned a majority of the capi-
tal stock of the shipping road.  By this stock of course it
controlled the selection of directors, a minority of whom
were directors of its own road.  This board of directors
selected the executive officers, several of whom respec-
tively held corresponding or other places in the organiza-
tion of the appellant.  Such executive officers at some
points occupied offices situate in the same building, and
in one case in the same suite of rooms with those main-
tained by the appellant.  In various reports made both

by the appellant and the Cincinnati Northern to public officials of the state of Ohio, it was stated in substance that the appellant "controlled" the latter road, but in each case such reports by other information made it plain that the control there spoken of had reference to the ownership of a controlling amount of stock.

In the second place, a "folder" and pages from a railroad guide were introduced which, amongst other things, advertised "New York Central Lines," and in connection therewith a "Big Four Route" (appellant being known as the Big Four railroad) and stated the aggregate "mileage of the Big Four Route as operated under the following divisions," one of which was the Cincinnati Northern railroad. In addition, one of appellant's officials who was called as a witness stated that for advertising purposes the Cincinnati Northern railroad was known as part of the "Big Four" route or system.

Lastly, a livery stable keeper called by the plaintiffs and who had never been connected with the operation of either road swore in terms that the Cincinnati Northern was operated by the appellant. However, this testimony by which he essayed with considerable confidence to settle the legal relationship of two important railroad corporations when stripped of what were mere conclusions shrank to a statement that he had at times seen rolling stock of the appellant like that of many other roads pass over the Cincinnati Northern. We are so thoroughly agreed on the inconclusive character of this testimony that it may be eliminated from further discussion.

Doing this, the question substantially becomes whether evidence makes one railroad corporation responsible for the ordinary daily operations of another when it discloses that the first owns a majority of the capital stock of the latter and thereby controls its corporate organization, which, however, remains legally distinct and separate, and by reason of such stock control or other influence has assembled the latter road with others into a transporta-

tion " route " or system which is advertised and known by its name. I do not think that it does, and certainly in my opinion it does not warrant such a conclusion when in addition to the facts thus summarized it further appears as in this case that the subordinate railroad in all respects maintains its corporate identity, makes its own contracts, keeps its own accounts, collects its own revenues and pays its own operating expenses and that the only financial interest of the controlling road is by way of dividends on its stock.

It is well established that the ownership of a majority of the stock of a corporation, while it gives a certain control of the corporation, does not give that control of corporate transactions which makes the holder of the stock responsible for the latter. This question was recently settled in *Senior* v. *N. Y. City Ry. Co.* (111 App. Div. 39; affirmed, without opinion, 187 N. Y. 559). In that case it appeared that the defendant owned more than ninety per cent of the capital stock of the Forty-second Street Railroad Company and operated a railroad intersecting the same. It was sought to hold it responsible for a penalty under a statute which provided that no corporation " constructing and operating a railroad " should charge any passenger more than five cents for one continuous ride, etc. The defendant, subject to the general provisions of law, absolutely controlled the organization and thus indirectly the operations of the Forty-second street line, but it was pointed out in the opinion of the Appellate Division that mere control of a corporation operating a railroad did not mean in a legal sense control of the operation of the road, and that a person could not be said to be in control of the management of the property of a corporation simply because he owned a majority of the latter's stock.

In *Pullman Palace Car Co.* v. *Missouri Pac. Ry. Co.* (115 U. S. 587) the plaintiff, under a contract whereby the defendant agreed to use the former's cars on " its own line of road and all roads which it now controls or may here-

after control," etc., sought to compel the use of its cars on the St. Louis & Iron Mountain Railway on the ground that the defendant controlled the latter company. The court dismissed the bill, saying: "Confessedly the St. Louis, Iron Mountain and Southern Company keeps up its own corporate organization. It operates its own road. It has its own officers, and makes its own bargains. The Missouri Pacific owns all, or nearly all, its stock, and in that way can determine who shall constitute its board of directors, but there the power of that company over the management stops. The board when elected has controlling authority, and for its doings it is not necessarily answerable to the Missouri Pacific Company. The two roads are substantially owned by the same persons and operated in the same interest, but that of the St. Louis, Iron Mountain and Southern Company is in no legal sense controlled by the Missouri Pacific. * * * The Missouri Pacific Company has bought the stock of the St. Louis, Iron Mountain and Southern Company, and has effected a satisfactory election of directors, but this is all. It has all the advantages of a control of the road, but that is not in law the control itself. Practically it may control the company, but the company alone controls its road. In a sense, the stockholders of a corporation own its property, but they are not the managers of its business or in the immediate control of its affairs. Ordinarily they elect the governing body of the corporation, and that body controls its property. Such is the case here. * * * It (the defendant) is not the corporation, in the sense of that term as applied to the management of the corporate business or the control of the corporate property." (p. 596.)

Evidence that a railroad corporation by reason of stock ownership in one or more other similar corporations has been influential in bringing them into a connected system or route advertised or known under its name seems similarly deficient in establishing actual operation by the former of all the others where each of the latter maintains its corpo-

rate identity and its individual operating organization. The organization of such a route or system does not fairly imply such operation by the one of all the others. In the absence of further proof it rather implies that several lines of road have been brought into an harmonious operation to secure convenience to passengers and shippers and for the purpose so far as possible of keeping the traffic which originates on one road of the system on the other connecting roads thereof.

I suppose that plaintiff's evidence in respect to the "Big Four Route" as indicating operation by appellant of the road by which they shipped their horses, possesses no special potency because it relates to railroads. And yet if the attempt were made to apply their theory on equivalent evidence to other transactions it seems to me that it would not be seriously considered. It has of recent times become somewhat common to organize what is known as a chain of banks. We may easily assume that an individual or corporation residing or located in New York city might obtain control of a majority of the capital stock in each of several banks located throughout the state and thereby control the corporate organization of each one. It may be further assumed that vanity would lead the controlling power to give its name to this line of institutions and that its wishes would be a powerful influence operating on the corporate organization of each in the conduct of its daily business. Nevertheless, I believe that if a person making a deposit in a bank of distinct corporate identity located in Rochester or Buffalo and accepting its pass book or certificate of deposit as exclusive proof of his contract should bring an action against the promoting and stock controlling individual or corporation in New York city for his deposit he would meet with prompt and unquestionable defeat.

The facts making up this branch of plaintiff's evidence are in important particulars similar to those dealt with in *Penn. R. R. Co.* v. *Jones* (155 U. S. 333) and *Peterson* v. *Chicago, Rock Island and Pacific R. Co.* (205 U. S.

364), and some of the views expressed in each of those cases strongly support the ones here adopted.

In the former case it was sought to hold the plaintiff in error responsible for an accident caused in part by a train of the Alexandria & Fredericksburg R. R. Co. In addition to a stock ownership by the Pennsylvania railroad company therein advertisements were proved of a "Pennsylvania Route," which included the Alexandria road, and it was shown that certain traffic officers of the Pennsylvania Railroad Co. occupied similar positions in the organization of the other road. The court commenting on these and other facts said: "Taking the plaintiffs' evidence as a whole, and supplementing it with such facts, favorable to them, as appear in the defendant's evidence, we are unable to see that a case was made out as against the Pennsylvania Railroad Company. That the Pennsylvania Railroad Company owned stock and bonds of some of the other companies defendant did not tend to show a partnership or agreement to run the roads of the latter on common account. * * * That the Pennsylvania Railroad Company advertised that it ran trains, or connected with trains of other companies, so as to form through lines, without breaking bulk or transferring passengers, did not tend to show any contract or agreement between the companies to share profits and losses. Nor was there evidence, in the present case, that there was any actual participation by the Pennsylvania Railroad Company in the earnings of the other companies which used the road between the cities of Alexandria and Washington." (p. 344.)

*Peterson* v. *Chicago, Rock Island and Pacific R. Co.* involved a question of jurisdiction. An attempt was made to serve process on the defendant road in the state of Texas by delivery to an officer of another corporation controlled by it through stock ownership on the ground that through the latter corporation it was doing business in said state. Amongst other things, it appeared that the defendant owned practically all of the capital stock of the

local road, and that the latter belonged to and was adver-
tised by the former as part of the "Rock Island System."
Nevertheless, the court overruled the plaintiff's conten-
tion, saying, "It is a fact that both companies had com-
mon agents and employees to a certain extent, but the
record shows that such employees were paid in proportion
to the business done for each company. And that while in
the service of the companies respectively they were under
the exclusive management and control of the company in
whose service they were engaged, with no power to dis-
charge or employ, the one company for the other; and
that, although the service was in a sense common, it was
kept distinct and separate in the control and payment of
the employees while in the separate service of the respec-
tive companies. It is true that the Pacific Company
practically owns the controlling stock in the Gulf Com-
pany, and that both companies constitute elements of the
Rock Island system. But the holding of the majority
interest in the stock does not mean the control of the
active officers and agents of the local company doing
business in Texas. That fact gave the Pacific Company
the power to control the road by the election of the
directors of the Gulf Company, who could in turn elect
officers or remove them from the places already held; but
this power does not make it the company transacting the
local business." (p. 390.)

Three cases are cited by respondent as especially sus-
taining his recovery. (*L. V. R. Co.* v. *Dupont*, 128
Fed. Rep. 840; *L. V. R. Co.* v. *Delachesa*, 145 Fed.
Rep. 617; *Penn. R. R. Co.* v. *Rossett*, 116 Ill. App. 342.)
In each of these cases a recovery was allowed against the
defendant for an accident occurring on or in connection
with a railroad immediately owned by another corpo-
ration. It is not practicable here to analyze all of the
facts appearing in each of those cases for the purpose of
showing, as I think clearly to be the fact, at least in the
first two, that they were stronger for the plaintiff than in

this action. In the first one amongst other things it appeared that the injured person was a passenger traveling on a ticket issued solely by the defendant carrying him over the road where he was injured and which was indirectly owned by it as stockholder. The court held that thereby the defendant assumed "All the ordinary obligations of a passenger carrier during the transit." The second case involved the same roads as the first one and was largely decided upon its authority as controlling. The person here injured was a workman of another company. The cars and engine in connection with which he was working belonged to the defendant, and it was held that there was sufficient evidence to permit the jury to find that the men whose negligence caused the injury were temporarily employees of the defendant.

In the third case the question was whether defendant was managing and operating a road the legal title to which rested in another corporation whose stock was directly or indirectly owned by the defendant. I judge from the somewhat incomplete report that there was evidence which from our standpoint permitted a decision of the question in favor of plaintiff. If there was not, I should be unwilling to follow the decision.

Some suggestion is made that the appellant should be held responsible in this case by reason of its folder and time table already referred to whereby respondents were led to rely on its control of and responsibility for the operations of the Cincinnati Northern railroad. The evidence as a whole, and especially the contract made with the latter road, thoroughly rebuts any idea that the respondents were misled or were relying on any responsibility of the appellant in their shipment.

In my opinion the judgment appealed from should be reversed and a new trial granted, costs to abide event.

CULLEN, Ch. J., GRAY, WILLARD BARTLETT, CHASE and COLLIN, JJ., concur; VANN, J., dissents.

Judgment reversed, etc.