MINNIE B. BERKEY, Respondent, *v.* THIRD AVENUE RAILWAY COMPANY, Appellant.

CHARLES P. BERKEY, Respondent, *v.* THIRD AVENUE RAILWAY COMPANY, Appellant.

**Negligence — railroads — contract between railroad corpora-tions by which one is to use other's franchise illegal unless approved by Public Service Commission — inference of existence of such an illegal contract not drawn from ownership by one corporation of stock of other and conduct appropriate to such ownership — complaint in action against dominant company for personal injury from negligence of motorman of car on subsidiary road, dismissed.**

1. A contract, written or oral, between two railroad corporations by which one is to use and operate the other's franchise as its own, if made, would be not only *ultra vires*, but illegal, because prohibited by section 54 of the Public Service Commissions Law which provides that no such contract shall be valid unless approved by the Commission.

2. An inference of the existence of such a contract will not be drawn, therefore, merely from the facts that the one company owned substantially all of the stock of the other, the members of the two

boards of directors were nearly the same, each road had the same executive officers, the dominant company had made loans to its subsidiary from time to time for construction and operating expenses and that cars marked in the same way were used over the entire system covering the larger part of the borough of Manhattan and extending into Westchester county. Such conduct is appropriate to the ownership of stock and fairly explicable thereby and does not warrant inference of an agreement criminal in conception and effect, especially where separate life and operation of the subsidiary are indicated by its keeping its own bank account from which it paid its operative employees and that from the date of its organization, in which it does not appear the now dominant company had any interest, it has preserved its corporate organization with property adequate to the maintenance of its life.

3. An action, therefore, brought against the dominant company to recover for a personal injury occasioned through the negligence of the motorman operating a car on the subsidiary road, cannot be maintained and the complaint was properly dismissed.

*Berkey* v. *Third Avenue Railway Co.* (2 cases), 217 App. Div. 504, reversed.

(Argued December 3, 1926; decided December 31, 1926.)

APPEAL, in each of the above-entitled actions, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered July 13, 1926, reversing a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term and granting a new trial.

*Alfred T. Davison* and *Addison B. Scoville* for appellant. The evidence herein conclusively shows that the car from which the plaintiff alighted at the time of the accident was operated by the Forty-second Street Railway Company over its own railway line on Broadway. (*Doran* v. *New York City Interborough R. Co.,* 239 N. Y. 448; *Stone* v. *C., C., C. & St. L. R. Co.,* 202 N. Y. 352.) The fact that the Third Avenue Railway Company owns a majority of or controlling interest in the stock of the Forty-second Street Railway Company does not make the Third Avenue Railway Company, as such stockholder,

responsible for the ordinary daily operations of the Forty-second Street Railway Company. (*Stone* v. *C., C., C. & St. L. R. Co.*, 202 N. Y. 352; *Matter of Vannier* v. *Anti-Saloon League*, 238 N. Y. 457.) The Appellate Division erred in holding that the trial court should have submitted to the jury the question whether the defendant Third Avenue Railway Company made use of its ownership and control of the Forty-second Street Railway Company, not merely for the purpose of participating in its affairs, but for the purpose of using it as a mere instrumentality to carry on defendant's business. (*Demarest* v. *Flack*, 128 N. Y. 205; *Elenkrieg* v. *Siebrecht*, 238 N. Y. 254.)

*George F. Canfield, R. Randolph Hicks* and *Thomas F. Compton* for respondent. The dominant corporation is liable or at least it is a question for the jury to decide whether as a matter of fact it is liable for torts committed by its subsidiary. (*Summo* v. *Snare & Triest Co.*, 166 App. Div. 425; *Otway* v. *Snare & Triest Co.*, 167 App. Div. 128; *Anthony* v. *American Glucose Co.*, 146 N. Y. 407; *C., M. & St. P. R. Co.* v. *Minn. Civic & Commerce Assn.*, 247 U. S. 490; *Lehigh Valley R. R. Co.* v. *Dupont*, 128 Fed. Rep. 840; *Lehigh Valley R. R. Co.* v. *Delachesa*, 145 Fed. Rep. 617; *Crown Cork & Seal Co.* v. *Brooklyn Bottle Stopper Co.*, 190 Fed. Rep. 323; *Foard Co. of Baltimore City* v. *State of Maryland*, 219 Fed. Rep. 827; *The Willem Van Driel, Sr.*, 252 Fed. Rep. 35; *Luckenbach S. S. Co.* v. *Grace & Co.*, 267 Fed. Rep. 676; *Wilkinson* v. *Walker*, 294 Fed. Rep. 939.) A railway company which operates a unified system through the device of subsidiary corporations may be held responsible for accidents occurring on the line of any subsidiary company, provided it appears that such subsidiary company is operated as an integral part of the unified system and as an instrumentality for performing the service of that system. (*C., M. & S. P. R. Co.* v. *Minn. Civic Assn.*, 246 U. S. 490; *Davis*

v. *Alexander*, 269 U. S. 114; *Dobbins* v. *Pratt Chuck Co.*, 242 N. Y. 106.)

CARDOZO, J.   The plaintiff boarded a street car at Fort Lee Ferry and One Hundred and Twenty-fifth street on October 4, 1916, in order to go east on One Hundred and Twenty-fifth street to Broadway, and thence south on Broadway to Columbia University at One Hundred and Seventeenth street.   She was hurt in getting out of the car through the negligence of the motorman in charge of it.   The franchise to operate a street railroad along the route traveled by the plaintiff belongs to the Forty-second Street, Manhattanville and Saint Nicholas Avenue Railway Company (described for convenience as the Forty-second Street Company) and no one else.   Substantially all the stock of that company is owned by the Third Avenue Railway Company, the defendant, which has its own franchise along other streets and avenues. Stock ownership alone would be insufficient to charge the dominant company with liability for the torts of the subsidiary (*Elenkrieg* v. *Siebrecht*, 238 N. Y. 254; *Stone* v. *C., C., C. & St. Louis Ry. Co.*, 202 N. Y. 352).   The theory of the action is that under the screen of this subsidiary and others, the defendant does in truth operate for itself the entire system of connected roads, and is thus liable for the torts of the consolidated enterprise (*Chicago, etc., Ry. Co.* v. *Minn. Civic Assn.*, 247 U. S. 490; *Davis* v. *Alexander*, 269 U. S. 114).

We are unable to satisfy ourselves that such dominion was exerted.   The Forty-second Street Company deposits in its own bank account the fares collected on its route. It pays out of that account and no other the wages of the motormen and conductors engaged in the operation of its cars.   It was not organized by the defendant as a decoy or a blind.   It was not organized, so far as the record shows, by the defendant at all.   There is no evidence that at the time of its formation the defendant had any

interest in it as shareholder or otherwise. Its franchise goes back to the year 1884, and through all the intervening years it has preserved its corporate organization with property adequate to the maintenance of life. Its balance sheet for the year ending July, 1917, shows assets of $12,456,847.86. The values there stated are much in excess of the debts and liabilities, including in the reckoning of liabilities the outstanding capital stock. In no possible view, even if they are to be scaled down to some extent, are they unsubstantial or nominal. True the subsidiary lost money that year, but so also did its parent. The fact remains that it was functioning as a corporation continuously and actively. It was so functioning at the trial in 1924. There is no evidence or suggestion that it has ceased to function since.

The question is whether other circumstances yet to be noted neutralize these indicia of separate life and operation. The defendant, as we have seen, was the owner in 1916 of substantially all the stock of the subsidiary corporation. Its president in reporting to the stockholders the financial situation at the end of the fiscal year informed them that to make the picture accurate, the statement must exhibit the consolidated income, and this was obviously true. Other ties must be shown in addition to the one resulting from ownership of shares. The members of the two boards of directors were nearly, though not quite the same. Each road had the same executive officers, *i. e.*, the same president, treasurer, general manager, paymaster and counsel. The parent has made loans to the subsidiary from time to time, sometimes for construction, sometimes for operating expenses. The loan for construction expenses ($6,415,152.92) is represented by a demand note. There is nothing to show whether the money was borrowed for the original construction in 1884 or for later changes of construction when the road was electrified. The parent is also the holder of the second mortgage bonds, $1,487,000,

the first mortgage bonds, however ($1,200,000), being issued to the public. The operating loans are temporary advances for electric power, for materials or supplies and for the salaries of executive officers. As a matter of convenience these are made in the first instance out of the treasury of the parent company. They are then charged to the account of the subsidiary, and repaid generally the following month, and not later than the following year. Repayment is inconsistent with an understanding that the parent in making the advances was operating on its own account the cars of a connecting line. The charges are more than book entries, mere devices of an accountant. Drafts are drawn upon the subsidiary and paid with its own money. The unpaid advances for operation in July, 1917, were only $253,029.37, and this at the end of a poor year. We are not to confuse the salaries of the executive officers with the wages of motormen and conductors. The latter, as already pointed out, were paid in the first instance as well as ultimately by the subsidiary itself. So were many other expenses for maintenance and repair. So were the many judgments for personal injuries recovered in the past.

One other circumstance or group of circumstances is the subject of much emphasis in the arguments of counsel. The defendant was the dominant stockholder, not only in this subsidiary, but also in many others. The routes when connected cover an area from the lower part of Manhattan at the south to Yonkers and other points in Westchester at the north. All the cars, wherever used, are marked " Third Avenue System." On the other hand, the transfer slips bear the name in each instance of the company that issues them. The cars, when new ones become necessary, are bought by the defendant, and then leased to the subsidiaries, including, of course, the Forty-second Street Company, for a daily rental which is paid. The cars leased to one road do not continue along the routes o᾿ others. The motormen and

conductors do not travel beyond their respective lines. With the approval of the Public Service Commission, transfer slips are issued between one route and another, but transfers could have been required by the Commission if not voluntarily allowed (Public Service Comm. Law, § 49, subds. 3 and 6; Cons. Laws, ch. 48).

. Upon these facts we are to say whether the parent corporation, the owner of a franchise to operate a street railroad on Third avenue and the Bowery and a few connected streets, has in truth operated another railroad on Broadway and Forty-second street, and this in violation of the statutes of the State. The plaintiff's theory of the action requires us to assume the existence of a contract between the defendant on the one side and the Forty-second Street Company on the other. The several circumstances relied upon — community of interest and in a sense community of management — are important only in so far as they are evidence from which the existence of a contract may fairly be inferred. The contract in the plaintiff's view was one between the two corporations by which the defendant was to use and operate the other's franchise as its own. If such a contract was made, it was not only *ultra vires*, but illegal, because prohibited by statute. By Public Service Commissions Law (§ 54), " no franchise nor any right to or under any franchise, to own or operate a railroad or street railroad shall be assigned, transferred or leased, nor shall any contract or agreement with reference to or affecting any such franchise or right, be valid or of any force or effect whatsoever, unless the assignment, transfer, lease, contract or agreement shall have been approved by the proper commission." By section 56 any violation of the provisions of the statute exposes the offending corporation to continuing fines of large amounts, and its officers and agents to prosecution and punishment as guilty of a misdemeanor. If a written contract had been made for the operation by the defendant of the subsidiary's line, no one

would doubt that such contract would fall within the condemnation of section 54 of the act. The contract is not the less illegal because made by word of mouth.

We cannot bring ourselves to believe that an agreement, criminal in conception and effect, may be inferred from conduct or circumstances so indefinite and equivocal. Community of interest there must obviously be between a subsidiary corporation and a parent corporation, the owner of its stock. This community of interest would prompt the parent, not unnaturally, to make advances for operating expenses to the subsidiary when convenience would be thus promoted. The advances so made have for the most part been repaid, and in so far as they remain unpaid have been carried as a debt. During all this time the cars have been manned by the subsidiary's servants, who are paid for their work out of the subsidiary's fares. We do not stop to inquire whether the inference of unified operation would be legitimate in a case where a contract for such an extension of the area of activity would be permitted by the law. We feel assured that no such inference is to be drawn from acts so uncertain in their suggestions where the inference is also one of the commission of a crime. The law prohibits a contract for operation by the parent of a franchise other than its own without the consent of the appropriate commission. It does not prohibit stock ownership, or at least did not, so far as the record shows, when the defendant bought the shares. We are now asked to draw from conduct appropriate to the ownership of stock, and fairly explicable thereby, the inference of a contract prohibited by law. We do not obviate the difficulty when we say that the stockholders by acquiescence have ratified any departure from the restrictions of the charter. They could do this so as to wipe out the transgression of their officers if the act constituting the transgression were *ultra vires* only. They could not do so where the act was one prohibited by law

(*Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159). The statute is aimed at more than the protection of the stockholders. It protects the creditors also, and beyond the creditors the public. Creditors are to be guarded against an increase of liabilities and an impairment of assets by an extension of corporate activities not approved by the Public Service Commission, the representative of the State. The public is to be guarded against like consequences, for the public which rides upon the cars has an interest, not to be ignored, in cheap, continuous and efficient operation. These benefits cannot be enjoyed if a road has been plunged into insolvency by improvident extensions. "The business of a railroad [*i. e.*, a street railroad] is to run its own lines. The law does not permit it at its pleasure to run the lines of others" (*Doran* v. *N. Y. City Int. Ry. Co.*, 239 N. Y. 448).

We do not mean that a corporation which has sent its cars with its own men over the route of another corporation may take advantage of the fact that its conduct in so doing is illegal to escape liability for the misconduct of its servant (*Nims* v. *Mt. Hermon Boys School*, 160 Mass. 177; *Bissell* v. *Mich. R. R. Co.*, 22 N. Y. 258). There is no room for varying constructions when operation results from acts so direct and unequivocal. A defendant in such circumstances is liable for the tort, however illegitimate the business, just as much as it would be if its board of directors were to order a motorman to run a traveler down. We do mean, however, that an intention to operate a route in violation of a penal statute is not to be inferred from acts which reasonably interpreted are as compatible with innocence as with guilt (*Shotwell* v. *Dixon*, 163 N. Y. 43, 52). Such, it seems to us, whether viewed distributively or together, are the acts relied on here to establish an agreement between two corporations that the business of one shall be the business of the other. Many arrangements for economy of expense and for convenience of administration may be made between

carriers without subjecting them to liability as partners
or as coadventurers " either *inter sese* or as to third
persons " (*Ins. Co.* v. *Railro d Co.*, 104 U. S. 146, 158).
For like reasons such arrangements may be made without
establishing a relation of principal and agent.   Where the
coadventure or the agency, if created, carries consequences
along with it that are offensive to public policy, the law
will not readily imply the relation it condemns.   The
basis for the implication must be either intention or
estoppel.   We perceive no evidence sufficient to support
a finding of estoppel.   Intention is presumed, unless the
inference of innocence is belied with reasonable
certainty, to be conformable to law.

    There is no need to enter into a minute analysis of
cases such as *Davis* v. *Alexander* (269 U. S. 114); *Lehigh
Valley R. R. Co.* v. *Dupont* (128 Fed. Rep. 840); *Lehigh
Valley R. R. Co.* v. *Delachesa* (145 Fed. Rep. 617); *A., T.
& S. F. R. R. Co.* v. *Davis* (34 Kan. 199); *Wichita Falls,
etc., Ry. Co.* v. *Puckett* (53 Okla. 463); and many others
that might be added.   In none of them was an illegal
agreement imputed to the dominant railroad by force of
conduct fairly compatible with an innocent construction.
On the contrary, the defendant in every case would have
acted wholly within its rights if it had assumed liability
as principal by an unequivocal engagement.   Thus, in
*Davis* v. *Alexander* (*supra*) a contract for the carriage of
goods was made in Texas, the transportation to begin on
the route of the parent corporation and to continue over
the line in the ownership of the subsidiary.   There is no
doubt that at common law a corporation doing business
as a carrier of passengers or goods may charge itself with
liability for loss on a connecting line, and to that end
may enter, within reasonable limitations not yet accurately
defined, into a joint adventure with another (*Swift* v. *Pac.
Mail S. S. Co.*, 106 N. Y. 206, 216, 217).   The situation
was the same in *Lehigh Valley R. R. Co.* v. *Dupont* and
*Lehigh Valley R. R. Co* v. *Delachesa* (*supra*).   Indeed, in

the *Dupont* case the court was at pains to point out that the contract of carriage, if extended to the connecting route, was not even *ultra vires* (128 Fed. Rep. at p. 845). Other differences are exposed when we press the process of dissection farther. Thus, in *Davis* v. *Alexander* (*supra*) the case was submitted to the jury upon the theory that the proceeds of operation over the two routes were commingled in a single fund. Not only that, but engines and cars were used indiscriminately, and so also were the crews. The jury were told that all these facts must be found to coexist before the wrong of the subsidiary could be charged against the parent. The Supreme Court in its opinion does not catalogue the circumstances supporting the inference of unity of control. The opinion is confined to the statement that " the shippers introduced substantial evidence in support of their allegations." The facts are disclosed when we examine the record on appeal. So in *Wichita Falls Ry. Co.* v. *Puckett* (*supra*) the same employees worked on the entire route, and a common treasury received the proceeds of the system. Between such cases and the one before us there exists a distinction plain upon the surface. This being so, there is no need to choose between the Federal doctrine and our own, if indeed when they are understood, there is any difference between them. Liability of the parent has never been adjudged when the subsidiary has maintained so consistently and in so many ways as here the separate organization that is the mark of a separate existence, and when the implication of a contract for unity of operation would be the implication of a contract for the commission of a crime.

The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the

parent corporation operates a business through a subsidiary which is characterized as an " alias " or a " dummy." All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20). The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (*Chicago, etc., Ry. Co.* v. *Minn. Civic Assn.*, 247 U. S. 490; *United States* v. *Reading Company*, 253 U. S. 26, 61, 63). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form. · We find in the case at hand neither agency on the one hand, nor on the other abuse to be corrected by the implication of a merger. On the contrary, merger might beget more abuses than it stifled. Statutes carefully framed for the protection, not merely of creditors, but of all who travel upon railroads, forbid the confusion of liabilities by extending operation over one route to operation on another. In such circumstances, we thwart the public policy of the State instead of defending or upholding it, when we ignore the separation between subsidiary and parent, and treat the two as one.

The order of the Appellate Division should be reversed, and the judgment of the Trial Term affirmed with costs in the Appellate Division and in this court.

CRANE, J. (dissenting). The United States Supreme Court in *Davis* v. *Alexander* (269 U. S. 114) said: " Where one railroad company actually controls another and operates both as a single system, the dominant company will be liable for injuries due to the negligence of the subsidiary company." This court decided in *Stone* v. *Cleveland, C., C. & St. L. Ry. Co.* (202 N. Y. 352) " that the ownership of a majority of the stock of a corporation, while it gives a certain control of the corporation, does not give that control of corporate transactions which makes the holder of the stock responsible for the latter."

These two decisions are not inconsistent. Each depends upon the particular facts and the nature and extent of the control by the dominant company of the subsidiary. It is largely a question of degree. This was recognized in the opinion in the *Stone* case when referring to the Federal authorities. We there said (p. 361) that the facts in those cases were stronger for the plaintiff than in the *Stone* action.

On this appeal we must determine which of these two rules is applicable to the facts in this case. The Trial Term dismissed the plaintiff's complaint. The Appellate Division has reversed and granted a new trial, holding that it was a question of fact for a jury to determine whether the Third Avenue Railway Company was liable for an injury to the plaintiff happening on the line of the Forty-second Street, Manhattanville and St. Nicholas Avenue Railway Company, called the Forty-second Street Railway Company.

The plaintiff was injured on the evening of October 4, 1916, by stepping into an unlighted excavation in the street, while alighting from a car at the corner of Broadway and One Hundred and Seventeenth street. The proof of negligence for this appeal is unquestioned and need not be further mentioned, so that we may turn our attention at once to the corporation responsible.

The Forty-second Street Railway Company is a street

railroad corporation having a franchise to operate passenger cars through Broadway at the point in question. Its authorized capital stock is $2,500,000, of which $2,494,900 is outstanding, and of this the Third Avenue Railway Company owns $2,471,300. The Third Avenue Railway Company is also a duly authorized and chartered railroad, operating surface lines in the city of New York connecting with and transferring to the cars running on the Forty-second Street line. Its system, which includes the Third Avenue and Amsterdam line, the One Hundred and Twenty-fifth Street Crosstown line, Broadway-Kingsbridge line as well as the branches of the Forty-second Street Railway, was termed and called " The Third Avenue Railway System." The car from which the plaintiff fell had on it the words, " Third Avenue Railway System."

The report of the president to the stockholders for the year ending June 30, 1917, stated:

" The Third Avenue Railway System is composed of the Third Avenue Railway Company and the following subsidiary companies."

The Forty-second Street Railway Company was one of these named subsidiary companies.

" The Third Avenue Railway Company," says the report, " controls all the above companies through ownership of stock and to arrive at the result of the operations it is necessary to consolidate the income accounts and the balance sheets of all the corporations and eliminate the inter-company transactions so that all duplications may be avoided. This explanation is made in order that there may be no misunderstanding in considering the statements appearing in this report."

The outstanding second mortgage bonds, amounting to $1,487,000, were entirely owned by the Third Avenue Railway Company. This second mortgage was past due. ' 415,152.98 was due for construction. It was repre-

7

sented by a note of the Forty-second Street Railway Company given years ago to the Third Avenue Railway Company. It is a demand note.

The officers for both companies were the same. Edward A. Maher, Jr., was the assistant manager of the Third Avenue Railway Company and of the Forty-second Street Railway Company. His father, Edward A. Maher, was the general manager of both. Each railway company had the same president, treasurer, secretary and the same board of directors with some slight variation. "They were practically all the same directors." The following question was asked of Edward A. Maher, Jr.: " Q. Take the Third Avenue Railroad Company and the Forty-second Street and Manhattanville Railroad Company, were they identical? A. They were."

The general auditor, Walter Farrington, was asked:

" Q. I notice on page 6 of this report this statement: The Employes Association — the statement is as follows: ' The Association on June 30th, 1917, had a membership of 3,412, and had to its credit on that date New York City bonds valued at $79,833.30, and cash on deposit amounting to $13,285.51, the total of $93,116.81.' These employes were employes of the entire system? A. Yes.

" Q. The next item to which I would call your attention is on page 6: ' It is most gratifying to contrast the attitude of some of the employes of the company with the strikes, was the response of the men to the company's invitation to subscribe to the Liberty Loan of 1917 within two weeks of the announcement of the company's partial payment plan of 3,265 subscriptions which have been received from 73%, and investment of bonds to the value of $200,000.' That refers to the employes of the subsidiary companies as well as of the others; as well as of the Third Avenue? A. May I see what you are reading from?

" Q. Yes. ' Subscription to Liberty Loan Bonds.' A. It does.

1926.]          Dissenting opinion, per CRANE, J.      [244 N. Y. 84]

" Q. They are all treated as employes of the Third Avenue, with reference to that loan?  A. Employes of all the companies."

The company referred to, of which these men were the employes, was the Third Avenue Railway Company. In its report the company did not discriminate.

Again, the Third Avenue Railway Company had a printing plant, referred to as follows:

" Q. I find on page 9 of this report this expression: ' The economical effect to the operation of its own printing plant has continued during the past year.  All of the company's printing has been done in its own plant.'  That refers to the printing plant which was used for printing matter of not only the Third Avenue Railway Company, but of the subsidiary Companies?  A. It does, yes."

As to pensions for employes, the report of the president said: " Under this plan, any employes who have reached the age of seventy years after at least twenty years service with the company, or who have reached the age of sixty-five and have been incapacitated are eligible for pensions," etc.  That the company referred to was the Third Avenue Railway Company appears from this testimony:

" Q. You had a system of pensions for the employes, didn't you?  A. Yes.

" Q. That was entirely under the control of the Third Avenue Railway Company, wasn't it?  A. Yes.

" Q. Which handled that entirely; is that right?  A. Yes."

The executive officers, above referred to, were paid by the checks of the Third Avenue Railway Company; the general manager of the entire system had charge of the superintendents of operation, who in turn had control of the conductors and motormen, all of whom reported to a central school for instruction; repairs and construction were operated from a single department; the cars of

both the Third Avenue Railway Company and the Forty-second Street Railway Company were marked "Third Avenue Railway System;" the Third Avenue Railway Company contracted and paid for the electricity to be used in the system; there was one common purchasing agent, and it is conceded that the Third Avenue Railway Company in the first instance paid the bills for all general and miscellaneous expenses, including salaries of claim agents and expenses for services and for material purchased. The Third Avenue Company owned all the cars which were operated over the lines of the system. One paymaster for the entire system, with assistants, paid the motormen and conductors of the Forty-second Street Railway Company with cash obtained at the bank by checks drawn by Mr. Sage, who was the treasurer of the Third Avenue Railway Company and the Forty-second Street Railway Company. The testimony of this point is as follows:

"Q. How many paymasters were there for the whole system? A. I think there was one so-called paymaster, possibly two assistants.

"Q. And they were employes of the Third Avenue Railway Company? A. They were paid out of the Third Avenue Railway Company's general fund.

"Q. Was there any such department in the Forty-second Street and Manhattan Railway Company pay department? A. No. * * * They were employes just as much of the 42nd Street company as they were of the Third Avenue. * * *

"Q. Who pays that paymaster and his subordinates? A. The paymaster was paid out of the Third Avenue Company's fund."

The legal department for the adjustment and settlement of claims and the claims themselves were paid by the Third Avenue Railway Company. So, too, the accounting department was for the entire system paid by the Third Avenue Railway Company. Walter Farring-

1926.]        Dissenting opinion, per CRANE, J.     [244 N. Y. 84]

ton, the general auditor, testified as to the advertising:
" Q. Do you know where the money for that adver-
tising came from, from the various advertisements?   A.
Yes.

" Q. Who was it paid to?   A. It was paid to the
Third Avenue Railway."

Ely M. T. Ryder, engineer of the Forty-second Street
Railway Company, swore that the annual report of that
company states that the road was held in joint title by
the Third Avenue Railway Company and the Forty-
second Street Railway Company.

" Q. What does that mean, joint title?   A. That is
the title to the ownership of the road, which has nothing
to do with maintenance.

" Q. Then the ownership of the road is jointly in the
two companies; is that right?   A. It is so stated.

" Q. Will you go a little further and read the next
section, ' Operated jointly with,' and say whether the
same statement is not made there?   A. It states, ' Oper-
ated jointly with.'

" Q. That means the joint operation of the two, does
it not?   A. Yes.

" Q. Do you still adhere to your former statement that
it was operated alone by the Forty-second Street and
Manhattanville Railway Company?   A. I did not say
that it was operated alone, but it was maintained by the
Forty-second Street.

" Q. You admit that it is jointly owned, jointly
operated, but that you say that it is jointly — it is
maintained solely by the one road?   A. Correct."

These being the facts regarding the maintenance and
operation of the Third Avenue Railway System, what
is our conclusion?   Is it that the Forty-second Street
Railway Company maintained a separate and distinct
existence as a corporation operating its railroad as a
corporate entity under the guidance and control of its
own officers and board of directors?   Such to my mind

would be an absurd conclusion, especially in the face
of the declarations of the Third Avenue Railway Com-
pany through its officers.   They certainly know the facts,
and it is the facts, and the facts alone which the law
seizes upon to form and to justify its conclusion.   These
facts are that the Third Avenue Railway Company
owned and controlled the Forty-second Street Railway.
It dominated its entire existence.   It not only owned the
majority of the stock; it owned nearly all of its bonded
and floating indebtedness.   It officered it with its own
officers; it executed the work and the service by its own
executives; it paid the employes, including motormen
and conductors, by and through its own paymaster; it
bought and paid for all materials, supplies and operating
facilities.   Every activity as an operating railroad was
dominated, controlled and executed by the Third Avenue
Railway Company, its officers and employes.   Ryder, the
engineer, had it right when he said that both railroads
jointly owned and operated this branch of the system.

These are the facts which cannot be changed by mere
bookkeeping entries.   It is true that the Forty-second
Street Railway Company made out separate reports
required by law; that it existed as a corporation; that it
owned the street franchise; that upon the books of the
Third Avenue Company charges were made for the
various services and expenses to the Forty-second Street
Railway Company as though it were in reality an inde-
pendent, vital organism.   But all these things cannot
hide the reality or cover up the fact that the Third Avenue
Railway Company in operation, in control, in dominance,
in execution and in the furnishing of service to the city
of New York was the Forty-second Street Railway
Company.

No facts could exist which would justify the application
of the statement in the *Davis Case* (*supra*), if these facts
did not.   " Where one railroad company actually con-
trols another and operates both as a single system, the

dominant company will be liable for injuries due to the negligence of the subsidiary company." Such was the rule with which I commenced this opinion, as laid down in *Davis* v. *Alexander* by the United States Supreme Court, and such is the law which must be applied to the Third Avenue Railway Company in this case. Its activities fit it exactly. Other cases, nowhere near as strong in their facts of dominance as is this case, have held the controlling company liable. An analysis of these cases is not necessary. I shall simply refer you to them. *Chicago, M. & St. P. Ry. Co.* v. *Minn. Civic Assn.* (247 U. S. 490, 500, 501). A quotation may not be inapt at this point.

" Much emphasis is laid upon statements made in various decisions of this court that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two. * * *

" While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usua' manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies." (See, also, *U. S.* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257, p. 274; *Lehigh Valley R. R. Co.* v. *Delachesa*, 145 Fed. Rep. 617; *Lehigh Valley R. R. Co.* v. *Dupont*, 128 Fed. Rep. 840; *Summo* v. *Snare & Triest Co.*, 166 App. Div. 425; *Wichita Falls & N. W. Ry. Co.* v. *Puckett*, 53 Okla. 463; *Foard Co.* v. *State of Maryland*, 219 Fed. Rep. 827; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Davis*, 34 Kans. 199.)

The attorney for the appellant, with his customary fairness and frankness, admits that some of these authorities are directly against his contention, and he relies upon our ruling in *Stone* v. *Cleveland, C., C. & St. L. Ry. Co.* (202 N. Y. 352); *Elenkrieg* v. *Siebrecht* (238 N. Y. 254), and *Doran* v. *N. Y. City Interborough Ry. Co.* (239 N. Y. 448) as supporting his view, and as conflicting with these cited authorities. The *Stone* case I have already referred to. It follows *Peterson* v. *Chicago, Rock Island & Pac. Ry. Co.* (205 U. S. 364) in holding that mere stock ownership and control is not sufficient to make the one company liable for the other, its subsidiary. The facts in this case go much further than the facts in the *Stone* case, as I have already explained. *Elenkrieg* v. *Siebrecht* (238 N. Y. 254) dealt with real property owned by a corporation. It was there shown that the corporation and not the stockholder was liable for the care and maintenance of the real property. The corporation was in actual control as·much as any corporation can be and had engaged its authorized real estate agent to look after the property. We held that the fact that the principal stockholder had previously owned the real property which he conveyed indirectly to the corporation did not make him liable for the neglect of this agent. Here also was a question regarding control or dominance, a question of degree. The *Doran* case dealt merely with a question of pleading. In speaking of the relationship between these very railroads, this court said regarding an allegation that a motorman was the employe of a group of railroads making applicable the Workmen's Compensation Act, that a relation so extraordinary must rest upon something more than words of a doubtful import or equivocal conclusions. No such facts were related in the pleadings as were proved in this case. Besides, here one railroad, not a·group of railroads, is sought to be held as the actual employer.

For the reasons here stated, I believe the Appellate Division has rightly disposed of this case.

HISCOCK, Ch. J., McLAUGHLIN, ANDREWS and LEHMAN, JJ., concur; CRANE, J., dissents in opinion in which POUND, J., concurs.

Ordered accordingly.